572 So.2d 1336 (1990)
Joe Elton NIXON, Appellant,
v.
STATE of Florida, Appellee.
No. 67583.
Supreme Court of Florida.
November 29, 1990.
Rehearing Denied January 24, 1991.
*1337 T. Whitney Strickland, Jr. of Oven, Gwynn & Strickland, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen., and Patricia A. Conners, Gary L. Printy and Richard B. Martell, Asst. Attys. Gen., Tallahassee, for appellee.
EHRLICH, Justice.
Joe Elton Nixon appeals his conviction of first-degree murder and sentence of death for the 1984 murder of a Tallahassee woman. He also appeals his convictions of kidnapping, robbery, and arson and the trial court's departure from the recommended guideline sentence for those convictions. We have jurisdiction, article V, section 3(b)(1), Florida Constitution, and affirm the convictions and sentences.
On Monday, August 13, 1984, the charred body of Jeanne Bickner was found tied to a tree in a wooded area in Leon County. The next morning Ms. Bickner's car, the interior and trunk of which had been gutted by fire, was found in a Tallahassee drainage ditch. The same day, after receiving information from Joe Elton Nixon's girlfriend, Wanda Robinson, and brother, John Nixon, that he had admitted the killing, had been driving the victim's car prior to burning it, and had pawned two of her rings, Tallahassee police arrested Nixon. Nixon was charged with first-degree murder, kidnapping, robbery, and arson.
At trial, there was testimony that after church on August 12, 1984, Ms. Bickner went to a local mall to have lunch with friends. She parked her orange M.G. convertible in the mall parking lot. Ms. Bickner *1338 was later seen in the parking lot giving a black man jumper cables from the trunk of her car. Witnesses testified that on the afternoon of August 12 they saw the orange M.G. driven by a black male, later identified as Nixon, near the vicinity of the site where the body was found. Ms. Bickner's body was discovered by a couple riding through the woods who reported the incident to the police. The charred body was in a seated position tied around the waist with jumper cables to a pine tree. Her left arm was tied to another pine tree. Wanda Robinson, John Nixon and other witnesses testified that they saw Nixon driving Ms. Bickner's orange M.G. Robinson and John Nixon also testified that Nixon admitted killing a white woman by tying her with jumper cables and burning her. Nixon also showed them two of Ms. Bickner's rings and later said he had pawned the rings. Robinson and John Nixon also testified that on the morning of the fourteenth, Nixon told them that he was going to burn the orange M.G. There was testimony that Nixon attempted to sell the M.G. prior to burning it. A pawn shop receipt signed by Nixon for two of Ms. Bickner's rings was entered into evidence. A laboratory analyst for the Florida Department of Law Enforcement testified that Nixon's palm print was found on the trunk lid of Ms. Bickner's M.G.
After his arrest, in a taped confession which was played to the jury, Nixon admitted murdering Ms. Bickner. He described how he met Ms. Bickner at the mall and asked her to take him to his uncle's house because he was having car trouble. Once on the road, Nixon hit Bickner in the face. When she stopped the car, Nixon put her in the trunk and then drove to a secluded wooded area where he took her from the trunk and tied her to a tree with jumper cables. According to Nixon, the two talked about their lives. Ms. Bickner offered to give Nixon money, to sign her car over to him, begging him not to kill her. Nixon recounted how he burned Ms. Bickner's personal belongings and then threw the top of the convertible into the fire. At some point after placing a paper bag over her head, Nixon threw the smoldering convertible top on Ms. Bickner, setting her on fire. He then left the scene in the M.G. According to the medical examiner, Ms. Bickner was alive at the time she was set on fire and the fire was the cause of death. The jury convicted Nixon of the offenses charged. In accordance with the jury's recommendation, finding five aggravating factors[1] and no mitigating factors, the trial court imposed the death penalty.
Nixon raises seven claims in connection with the guilt phase of the trial and eight claims in connection with the penalty phase. Of the fifteen claims raised only nine merit discussion.[2]

GUILT PHASE
Nixon's first claim is that he was denied effective assistance of counsel when his *1339 trial counsel, without record approval of Nixon, conceded Nixon's guilt and sought leniency. This claim is based on the following comments by counsel made during opening statement and closing argument. In opening statement, defense counsel stated:
In this case, there will be no question that Jeannie [sic] Bickner died a horrible, horrible death. Surely she did and that will be shown to you. In fact, that horrible tragedy will be proved to your satisfaction beyond any reasonable doubt.
In this case, there won't be any question, none whatsoever, that my client, Joe Elton Nixon, caused Jeannie [sic] Bickner's death. Likewise, that fact will be proved to your satisfaction beyond any reasonable doubt. This case is about the death of Joe Elton Nixon and whether it should occur within the next few years by electrocution or maybe its natural expiration after a lifetime of confinement.
During closing argument defense counsel made the following comments:
Ladies and gentlemen of the jury, I wish I could stand before you and argue that what happened wasn't caused by Mr. Nixon, but we all know better. For several very obvious and apparent reasons, you have been and will continue to be involved in a very uniquely tragic case. In just a little while Judge Hall will give you some verdict forms that have been prepared. He'll give you some instructions on how to deliberate this case. After you've gotten those forms and you've elected your foreperson and you've done what you must do, you will sign those forms. I know you are not going to take this duty lightly, and I know what you will decide will be unanimous. I think that what you will decide is that the State of Florida, Mr. Hankinson and Mr. Guarisco, through them, has proved its case against Joe Elton Nixon. I think you will find that the State has proved beyond a reasonable doubt each and every element of the crimes charged, first-degree premeditated murder, kidnapping, robbery, and arson.
Nixon takes the position that counsel's statements were the functional equivalent of a guilty plea, requiring a record inquiry as to whether he knowingly and voluntarily consented to this strategy. Nixon argues that this concession of guilt resulted in a "complete breakdown in the adversarial process which resulted in a complete denial of his right to counsel" and therefore constitutes ineffective assistance per se under the United States Supreme Court's decision in United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). See, e.g., Wiley v. Sowders, 647 F.2d 642 (6th Cir.) (petitioner was deprived of effective assistance of counsel when defense counsel admitted petitioner's guilt, without first obtaining petitioner's consent to the strategy), cert. denied, 454 U.S. 1091, 102 S.Ct. 656, 70 L.Ed.2d 630 (1981); People v. Hattery, 109 Ill.2d 449, 94 Ill.Dec. 514, 488 N.E.2d 513 (1985) (defense counsel is per se ineffective where counsel concedes defendant's guilt, unless the record shows that the defendant knowingly and intelligently consented to this strategy), cert. denied, 478 U.S. 1013, 106 S.Ct. 3314, 92 L.Ed.2d 727 (1986); State v. Harbison, 315 N.C. 175, 337 S.E.2d 504 (1985) (it is per se ineffective assistance of trial counsel where counsel admits defendant's guilt without the defendant's consent), cert. denied, 476 U.S. 1123, 106 S.Ct. 1992, 90 L.Ed.2d 672 (1986).
Over Nixon's objection, this Court remanded to the trial court for an evidentiary hearing to determine whether Nixon was informed of the strategy to concede guilt and seek leniency. Order of October 27, 1987. After a second order of this Court, dated October 4, 1988, clarifying the procedure to be followed in connection with the evidentiary hearing, the defendant was allowed to present witnesses but the state was not. The state's cross-examination of Mr. Corin, Nixon's trial counsel, was limited to the scope of direct examination by the defense. Because the trial court did not interpret the order of October 4, 1988, as requiring him to make findings or conclusions, none were made. On further remand *1340 by order of February 1, 1989, the state was allowed to present witnesses. However, the state's examination of Mr. Corin was extremely limited due to his refusal to testify concerning matters not already addressed during his testimony for the defense absent Nixon's waiver of the attorney-client privilege. Nixon refused to waive the privilege and the state was unable to fully examine Mr. Corin.
We recognize the confusion resulting from our remand for these atypical proceedings and decline to dispose of this claim on the present state of the record which we view as less than complete.[3] Accordingly, we do so without prejudice to raise the issue in a later motion to vacate pursuant to Florida Rule of Criminal Procedure 3.850.
As his second claim, Nixon contends that the prosecutor made an impermissible "Golden Rule" argument when he told the jury "we have an obligation to make you feel just a little bit ... of what Jeanne Bicker [sic] felt." In closing argument during the guilt phase of the trial, the prosecutor stated:
I noticed sometimes people wonder about and I guess have different ideas on what makes a prosecutor tick. You probably wonder: Well, do Mr. Guarisco and I enjoy the fact that we're presenting this horrid thing to you. I assure you we don't.
Yet, at the same time, we have an obligation to make you feel just a little bit, just a little bit, of what Jeanne Bicker [sic] felt because, otherwise, sometimes I think it's easy to forget that. And the emotions involved in this case  and they are there. There are emotions going both ways in this case.
Hopefully, those emotions on the one hand where you are talking about imposing, well, the most serious penalties we have against a person which is an emotional thing are counterbalanced by the emotions of the terrible thing that's happened in this case. And then as a group of 12 people you can set this aside, set that aside and you make an objective decision. You follow the law that the Judge gives you because that's what we need you to do.
At the close of the state's argument, defense counsel moved for a mistrial, noting "at this time to instruct the jury to disregard it would be to no avail." After having the comment read back by the court reporter, the trial court denied the motion stating, "I don't think that's a Golden Rule argument. I think it's close, but I don't think that's a pure Golden Rule argument."
Initially we note that defense counsel failed to make a contemporaneous objection to the above remarks which were made at the commencement of the state's argument. Ordinarily, to preserve a claim based on improper comment, counsel has the obligation to object and request a mistrial. If counsel fails to object or if, after having objected, fails to move for a mistrial, his silence will be considered an implied waiver. Clark v. State, 363 So.2d 331, 335 (Fla. 1978), abrogated on other grounds, State v. DiGuilio, 491 So.2d 1129 (Fla. 1986). In connection with closing argument, a motion for mistrial need not be *1341 made in the next breath following the objection to the offensive remark. This rule avoids interruption in the continuity of the argument and affords defendants an opportunity to evaluate the prejudicial nature of the objectionable remarks in the context of the total argument. State v. Cumbie, 380 So.2d 1031, 1033 (Fla. 1980).
Nixon argues that under Cumbie, his motion for mistrial at the close of argument, absent a contemporaneous objection, was sufficient to preserve this issue for appeal. We do not construe Cumbie to obviate the need for a contemporaneous objection. The requirement of a contemporaneous objection is based on practical necessity and basic fairness in the operation of the judicial system. A contemporaneous objection places the trial judge on notice that an error may have been committed and thus, provides the opportunity to correct the error at an early stage of the proceedings. Castor v. State, 365 So.2d 701, 703 (Fla. 1978). While the motion for mistrial may be made as late as the end of the closing argument, a timely objection must be made in order to allow curative instructions or admonishment to counsel. As noted by defense counsel in this case, in many instances a curative instruction at the end of closing argument would be of no avail. Accordingly, defense counsel's motion for mistrial at the end of closing argument, absent a contemporaneous objection, was insufficient to preserve this claim under our decision in Cumbie. Even if the issue were properly preserved, we agree with the trial court that taken in context the comments complained of did not amount to a Golden Rule argument.
Nixon's third claim is that his absence during critical proceedings at various times throughout the trial requires reversal of his conviction and sentence. On July 8 and 9, 1985, Nixon refused to be present during a hearing on various pretrial motions. In both instances counsel waived Nixon's presence for the limited purpose of hearing the motions. Although Nixon was present at the commencement of jury selection on July 15, 1985, as voir dire continued on the morning of July 16, 1985, Nixon refused to enter the courtroom. Defense counsel explained to the judge that Nixon had disrobed to his underwear, and was demanding a black judge and a black attorney, and did not wish to return to the courtroom. After a recess, Nixon still refused to attend the trial. The trial judge then inquired of the bailiff as to why Nixon had not returned. The judge was informed that Nixon had told another officer that he was not going to court "for them to railroad me." Defense counsel informed the judge that Florida Rule of Criminal Procedure 3.180(b) allowed a defendant to voluntarily absent himself from the courtroom if the court chose to try Nixon in absentia. The trial court conducted a hearing in the holding cell to determine if it would be in Nixon's best interest to allow him to absent himself from the proceedings. During the hearing, Nixon was clad only in his underwear. He reiterated to the judge that he did not wish to return to the courtroom, that he wanted another attorney and wanted to return to the jail-house. Nixon threatened that if forced to return to the courtroom, "I still [sic] run my mouth and speak when I get ready unless you tape it up." Nixon repeatedly stated that he wanted to return to the jail-house and did not care if the trial proceeded without him. After questioning the officer who had transported Nixon from the jail to the holding cell concerning the events leading up to appellant's removal of his clothes and desire to return to the jail-house, the trial court indicated that if Nixon did not return to the courtroom that afternoon, the court would consider his decision "to be a knowledgeable, voluntary and intelligent waiver of his right to be present during the course of the trial." When Nixon refused to return to the courtroom that afternoon, the court found that Nixon had knowingly, intelligently, and voluntarily waived his attendance and that the proceedings would continue without him.
I have considered options including but not limited to, I think, the most severe step which is to compel the attendance of *1342 the Defendant by physically forcing his attendance in the courtroom, if necessary to manacle, bind and gag and the like.
It's my view that Mr. Nixon does not want to come to the courtroom. And to bring him into the courtroom under those circumstances would be manifestly prejudicial to this case. Therefore, I'm going to accede to his desire not to participate.
It's my view that we have done about as much as can possibly be expected to seek to accommodate attendance for him. To seek to persuade him to attend. To induce him to attend. We've even recessed Court for a period of time so that he might reflect upon that decision. That has been to no avail.
During voir dire, defense counsel asked prospective jurors if Nixon's absence would affect their impartiality and all replied that it would not. Thereafter, Nixon refused to attend most of his trial.
In Peede v. State, 474 So.2d 808, 814 (Fla. 1985), cert. denied, 477 U.S. 909, 106 S.Ct. 3286, 91 L.Ed.2d 575 (1986), we held that "a defendant can waive his right to be present at stages of his capital trial if he personally chooses to voluntarily absent himself." It is clear from the record that Nixon did not wish to attend the proceedings, threatening to disrupt them if so forced. A defendant will not be forced to attend his capital trial if his actions or the means used to ensure his presence would prejudice him in the eyes of the jury. As in Peede, the trial judge in this case took every precaution to ensure that Nixon's absence was voluntary. A hearing was held in Nixon's holding cell. A recess was initially taken to allow Nixon time to reflect on his decision. Counsel was allowed to question the prospective jurors to ensure Nixon's absence would not prejudice him. At various intervals throughout the proceedings the trial judge questioned a custodial officer to ascertain whether Nixon had evidenced a change of mind, which he had not. Under these circumstances, it was not error to proceed with the trial in Nixon's absence.
During the guilt phase of the trial seven photographs of the victim were entered into evidence over defense counsel's objection. Nixon contends that the admission of an "unnecessarily large number of inflammatory photographs" of the victim in a charred state resulted in a fundamentally unfair proceeding. He maintains that "there was no justifiable relevancy for the admissibility of the photographs since the cause of death and nature of death had been clearly established and there was no circumstance which necessitated the introduction of photographs of the victim." The test of admissibility of photographs such as these is relevancy rather than necessity. Gore v. State, 475 So.2d 1205, 1208 (Fla. 1985), cert. denied, 475 U.S. 1031, 106 S.Ct. 1240, 89 L.Ed.2d 348 (1986). Four of the photographs, exhibits 10G, 10H, 10K, and 10J, showing various positions of the victim's charred body tied to a tree at the crime scene were introduced by the state during the testimony of Deputy Gunter. The photographs were introduced to aid the detective in explaining the condition of the crime scene when the police arrived. See id. (allegedly gruesome photographs of victim relevant to show condition of the body when first discovered by the police and to show considerable pain inflicted on victim). The other three photographs, exhibits 12, 13A, and 13B, which were taken at the coroner's office and which show the victim's head and upper body were introduced during the pathologist's testimony. These photographs assisted the pathologist in explaining the nature of the victim's injuries and the cause of her death. See Bush v. State, 461 So.2d 936, 939 (Fla. 1984) (photographs are admissible where they assist the medical examiner in explaining to the jury the nature and manner in which the wounds were inflicted), cert. denied, 475 U.S. 1031, 106 S.Ct. 1237, 89 L.Ed.2d 345 (1986).
We do not agree that the seven photographs admitted, none of which were cumulative, constituted an unnecessarily large number of inflammatory photographs. Cf. Young v. State, 234 So.2d 341 (1970) (error *1343 to admit forty-five gruesome photographs of the victim), receded from on other grounds, State v. Retherford, 270 So.2d 363 (Fla. 1972). Nixon is correct that the challenged photographs are extremely gruesome; they accurately depict the fact, as noted in the trial court's sentencing order, that "Jeanne Bickner was the victim of a vicious, barbaric and savage murder." However, because the photographs are not so shocking in nature as to outweigh their relevancy, the trial court did not abuse its discretion in admitting them. Bush, 461 So.2d at 940.
We also find no merit to Nixon's next claim that the trial court erred in failing to establish the competency of a juror who was excused from service during the penalty phase of the trial due to emotional problems. The jury returned its verdict of guilty on Monday, July 22, 1985. On Wednesday, July 24, during the penalty phase of the trial, the trial judge was informed by the bailiff that he was concerned about Juror number 12, who was exhibiting "strange" behavior. With counsels' concurrence the trial judge decided that Juror number 12 should be monitored. At this point, defense counsel expressed concern that if Juror number 12, who was black, was removed from the jury it might upset the "representative mix" which had been achieved. Defense counsel also expressed concern that if the juror's problem was not a new one, it could have affected the jury's guilt determination. The next day, the bailiff informed the court that it had been difficult to get Juror number 12 ready to come to court because she locked herself in the bathroom. The bailiff also informed the court that he had learned that "a few years ago" Juror number 12 had a nervous breakdown and that she was "in the process of taking Lithium." According to the bailiff, the bizarre behavior was first manifested on Tuesday afternoon, July 23, the day after the conclusion of the guilt phase of the trial. The trial court determined that Juror number 12 should be replaced by an alternate. The court concluded that "the condition of Juror No. 12 did not manifest itself until the conclusion of the guilty/not guilty phase. I see no reason to disturb that facet of the case."
We agree with the state that the issue was not properly preserved for review. Although defense counsel evidenced concern that Juror number 12's problems may have affected the guilt phase of the trial, counsel never sought further judicial inquiry. Counsel did not object to the trial court's conclusion that Juror number 12's condition did not manifest itself until after the guilt phase of the trial was completed nor did he move for a mistrial. In fact, defense counsel acknowledged that "the onset of [Juror number 12's] symptoms was apparently post-guilt phase" and that "there is no clear indication" that Juror number 12 had mental problems that could have affected the jury's guilt-phase deliberations. Counsel also declined to voir dire Juror number 12 before the matter was concluded. Further, even if the issue had been preserved, there was insufficient evidence that Juror number 12 likely suffered from incompetence during the guilt phase to warrant further inquiry. See United States v. Mauldin, 714 F.2d 854 (8th Cir.1983) (absent substantial if not wholly conclusive evidence of incompetency, such as proof of an adjudication of insanity or mental incompetence made shortly before or after the trial, courts will not set aside a verdict or make further inquiry into a juror's competency during trial); United States v. Dioguardi, 492 F.2d 70 (2d Cir.) (same), cert. denied, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974).

PENALTY PHASE
Nixon's first claim raised in connection with the penalty phase of the trial concerns a statement made by Nixon after his arrest to Detective Livings concerning the removal of Ms. Bickner's underwear. During the penalty phase of the trial, Detective Livings testified that between 8:00 and 9:20 p.m. on the day of Nixon's arrest he asked Nixon about the victim's underwear. According *1344 to the detective, Nixon told him he had removed them because he wanted to scare her. Nixon maintains that the statement was inadmissible because it was given without full benefit of Miranda[4] warnings. We cannot agree.
There is no requirement that an accused be continually reminded of his rights once he has intelligently waived them. Bush v. State, 461 So.2d at 939. Nixon had been given full Miranda warnings on at least four separate occasions prior to his taped confession, twice at the time of his arrest, once in route to the police station, and once at 12:20 p.m. prior to giving the taped confession. Each time he stated that he understood his rights and prior to giving the taped confession he executed a written waiver which has not been challenged. Approximately eight hours after giving the taped confession, Detective Livings told Nixon that he had a question to ask him. The detective advised Nixon "that [Nixon] didn't have to talk with [him]; that [Nixon] did not have to give [him] any information; that [Nixon] still had the right to remain silent." After being reminded of his rights, Nixon indicated his willingness to speak with Detective Livings by stating "I got no problems talking with you." Although the detective did not give Nixon a full Miranda warning, the trial court correctly ruled that Nixon understood his rights and knowingly and intelligently waived them prior to the challenged statement and that his statement that he had no problem discussing the case was a valid waiver.
We also reject Nixon's claim the trial court erred in failing to instruct the jury on mitigating factors under sections 921.141(6)(b) (defendant was under the influence of extreme mental or emotional disturbance), 921.141(6)(f) (capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired), and 921.141(6)(g) (age of defendant at the time of the crime), Florida Statutes (1985). Nixon argues that although defense counsel requested that no instructions be given on statutory mitigating factors, the trial court had a duty to so instruct because there was evidence of each of these factors. Defense counsel specifically requested that only the following instruction be given:
The mitigating circumstances which you may consider are unlimited, and you may consider any evidence presented at trial and during the sentencing proceedings in mitigation of the defendant's sentence.
Since defense counsel requested that the instructions to which Nixon claims he was entitled not be given, he cannot now take the position that it was error to fail to give them. Further, while it may have been preferable to have instructed on the statutory mitigating factors urged, the catchall instruction given served as an adequate vehicle to allow the jury to consider all the mitigating evidence presented.
In connection with the above claim, Nixon also maintains that the trial court impermissibly refused to consider the mitigating evidence presented. While the trial court found that there was no evidence to support these mitigating factors, it is clear from the record that the court considered and rejected all the evidence presented.
Nixon next claims that the trial court erred in refusing to give a requested instruction informing the jury of the maximum sentences for kidnapping, robbery, and arson. During the penalty phase of the trial, defense counsel requested such an instruction, stating that he wanted "to be able to argue those potential punishments to the jury as part of the theory of defense." The trial court denied the request, noting that the jury obviously knew that it had convicted Nixon of the three other felonies. The court expressly noted that defense counsel was entitled to argue in mitigation that Nixon stood convicted of the other serious felonies. Defense counsel *1345 reiterated his objection to the court's refusal to give the requested instruction.
Nixon maintains that the fact that he was convicted of three other offenses which carried lengthy maximum penalties was a circumstance on which the jury should have been instructed under Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Florida Rule of Criminal Procedure 3.390(a) provides that "[e]xcept in capital cases, the judge shall not instruct the jury on the sentence which may be imposed for the offense for which the accused is on trial." This rule has been construed to mean that the jury need only be instructed as to the possible penalty when it is faced with the choice of recommending either the death penalty or life imprisonment. As to offenses in which the jury plays no role in sentencing, the jury will not be advised of the possible penalties. Coleman v. State, 484 So.2d 624, 628 (Fla. 1st DCA 1986).
As we recently noted in King v. Dugger, 555 So.2d 355, 359 (Fla. 1990), "Lockett requires that a sentencer `not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" The fact that Nixon was convicted of three other offenses each of which carried lengthy maximum penalties is irrelevant to his character, prior record, or the circumstances of the crime. Therefore, the trial court did not err in refusing to give the instruction. Even if it had been appropriate for the jury to be instructed on the maximum penalties for the other crimes, the requested instruction merely set forth the maximum sentences for each of the noncapital offenses. The instruction did not inform the jury that it could consider the maximum sentences for the noncapital offenses as a mitigating factor. The jury was aware of the noncapital offenses for which Nixon was convicted, counsel urged those convictions as mitigation, and the jury was instructed that the factors which it could consider in mitigation were unlimited.

GUIDELINES DEPARTURE
In connection with the kidnapping, robbery, and arson convictions, the trial court departed from the recommended guideline range of twelve-to-seventeen years, sentencing Nixon to consecutive terms of life imprisonment for kidnapping, fifteen years for robbery, and fifteen years for arson. The court based departure on the following: 1) the "[e]motional trauma suffered by the victim and her fear and emotional distress;" 2) Nixon's "escalating pattern of criminal conduct culminating in the instant offense;" 3) Nixon's status as an habitual offender; and 4) "[a]ny other reasons articulated by this Court at the sentencing hearing."
We agree that reasons 3 and 4 are not clear and convincing reasons for departure. Winters v. State, 522 So.2d 816 (Fla. 1988); Whitehead v. State, 498 So.2d 863 (Fla. 1986); State v. Jackson, 478 So.2d 1054 (Fla. 1985), abrogated on other grounds, Miller v. Florida, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987), receded from on other grounds, Wilkerson v. State, 513 So.2d 664 (Fla. 1987). However, we have held reasons 1 (emotional trauma) and 2 (escalating criminal conduct) to be clear and convincing under appropriate circumstances. In Tillman v. State, 525 So.2d 862, 864 (Fla. 1988), we explained that
emotional trauma of the victim, may serve as a clear and convincing reason for departure where there is evidenced "a discernible physical manifestation resulting from the psychological trauma," State v. Rousseau, 509 So.2d 281, 284-85 (Fla. 1987), or where there is evidence that the trauma is the result of "extraordinary circumstances which are clearly not inherent in the offense charged." Casteel v. State, 498 So.2d 1249, 1253 (Fla. 1986).
While there was no evidence of a physical manifestation of psychological trauma because *1346 the victim in this case died at the scene, there is credible evidence that after being abducted, Ms. Bickner was tied to a tree and terrorized before being burnt alive. These are extraordinary circumstances causing emotional trauma which are clearly not inherent in the crimes of kidnapping or robbery. Cf. Ochoa v. State, 509 So.2d 1115 (Fla. 1987) (emotional trauma not clear and convincing reason for departure where there were no "extraordinary circumstances" clearly not inherent in the crime of kidnapping causing the trauma).
Reason 2 (escalating pattern of criminal conduct) is a valid reason for departure, Keys v. State, 500 So.2d 134 (Fla. 1986), which is supported in this case by evidence of Nixon's prior criminal history. As a juvenile, Nixon was adjudicated delinquent six times in connection with various charges of shoplifting, petit larceny, grand larceny, possession or sale of stolen property, first-degree arson, possession of burglary tools, and burglary. As an adult, Nixon was convicted of armed robbery in 1980, burglary of a structure in 1981, attempted burglary of a dwelling in 1984 and the offenses for which he now stands convicted: arson, robbery, kidnapping, and murder.
While reason 4 (any other reasons articulated at sentencing) is not a clear and convincing reason for departure under our decision in Jackson, 478 So.2d at 1055-56, there do not appear to have been other reasons articulated at the sentencing hearing upon which the departure could have been based. Because we find beyond a reasonable doubt that the trial court would have departed in the absence of the invalid reasons, we need not remand for resentencing. Albritton v. State, 476 So.2d 158 (Fla. 1985).[5]
Accordingly, Nixon's convictions and sentences are affirmed.
SHAW, C.J., and OVERTON, McDONALD, BARKETT, GRIMES and KOGAN, JJ., concur.
NOTES
[1] The trial court found the following aggravating factors:

1) the defendant was previously convicted of another violent felony;
2) the murder was committed while the defendant was engaged in the commission of a kidnapping;
3) the murder was committed for pecuniary gain;
4) the murder was especially heinous, atrocious, or cruel; and
5) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.
[2] The following claims do not merit discussion:

1) that section 921.141, Florida Statutes (1983), is unconstitutional; 2) that the trial court erred by refusing to omit the words "a possible doubt" from the standard jury instruction on reasonable doubt; 3) that the penalty- and guilt-phase instructions impermissibly diminished the jury's sense of responsibility for its sentencing recommendation, in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); 4) that the trial court erred in failing to permit Nixon to make a statement at the sentencing proceeding; 5) that it was error for kidnapping and robbery to be considered in determining guilt and also used as an aggravating factor; and 6) that the trial court erred in barring prospective members of the jury from service without adequate inquiry under Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).
[3] The trial court found the following pursuant to our order of February 1, 1989:

1. Trial Defense Counsel Corin reviewed with Defendant/Appellant Nixon the defense approach to the case in general terms including, but not limited to, the probability that he would concede the killing of the victim by Nixon.
2. Corin and Nixon had previous attorney-client relationships, both were veterans of the criminal justice system and although Nixon manifested no reaction, he understood what was to take place.
3. Nixon made no objection and did not protest the strategy and tactic employed at trial.
Based on the foregoing, this Court concludes that the Defendant/Appellant Nixon has not sustained his burden of proof by the applicable standard that he (a) was neither informed nor knew of the trial strategy and tactic employed by Defense Trial Counsel Corin nor (b) did not consent thereto or (c) acquiesce therein.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] While our decision is not based on this factor, we note that Nixon's conviction of first-degree murder, a capital felony which cannot be scored as an additional offense at conviction, could have served as a valid reason for departure. Torres-Arboledo v. State, 524 So.2d 403, 414 (Fla.), cert. denied, 488 U.S. 901, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988); Hansbrough v. State, 509 So.2d 1081, 1087 (Fla. 1987).