706 So.2d 1 (1997)
Ernest WHITFIELD, Appellant,
v.
STATE of Florida, Appellee.
No. 86775.
Supreme Court of Florida.
September 11, 1997.
Rehearing Denied November 20, 1997 and February 19, 1998.
James Marion Moorman, Public Defender, and Douglas S. Connor, Assistant Public Defender, Tenth Judicial Circuit, Bartow, for appellant.
*2 Robert A. Butterworth, Attorney General, and Robert J. Landry, Assistant Attorney General, Tampa, for appellee.
PER CURIAM.
We have on appeal Ernest Whitfield's convictions and sentences for armed burglary, sexual battery with a deadly weapon, and first-degree murder, including a sentence of death for the first-degree murder conviction. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed, we affirm Whitfield's convictions and sentences.
At trial, evidence was presented to establish the following. In early June 1995, Whitfield went to the home of Claretha Reynolds. He asked Reynolds, Willie Mae Brooks, and Estella Pierre for money. Pierre was Whitfield's former girlfriend. When none of them would give him any money, he tried to snatch Pierre's purse. Reynolds grabbed Whitfield in a headlock and forcibly ejected him from her home. Whitfield told them as he left: "I'm going to kill all three of you bitches."
Several weeks later, in the early morning hours of June 19, 1995, Whitfield attempted to get Willie Mae Brooks to let him in Reynolds' house. Brooks refused and went back to sleep in the bed she shared with her one-year-old child. Whitfield subsequently unlawfully entered Reynolds' home. Armed with an eight-inch knife, he entered the bedroom in which Brooks was sleeping and raped Brooks, indicating that he would stab her and her child if she screamed. Whitfield then went into a different room where Reynolds and her five children were located. About ten minutes later, Reynolds stumbled into Brooks's room and asked her to lock the door. She was bleeding profusely from her wounds and told Brooks that she was dying and that Ernest had stabbed her. Brooks and one of Reynolds' children, a twelve-yearold, climbed out the window and ran to a neighbor's house to call police. Whitfield fled the scene. Reynolds died shortly after police arrived.
After he was apprehended, Whitfield admitted stabbing Reynolds and led police to the murder weapon.
The medical examiner testified that Reynolds was stabbed twenty-one times; seven of the wounds were potentially lethal and many of the wounds were seven inches deep. He further stated that, after Reynolds was stabbed, she was still fully conscious and aware that she was dying.
Whitfield's defense was based on voluntary intoxication by cocaine. A clinical psychologist, Dr. Regnier, testified regarding Whitfield's cocaine abuse and his 1991 Baker Act hospitalization. He stated that Whitfield exhibited symptoms consistent with the classic pattern of cocaine abuse. He further testified that there was no reason to believe that Whitfield was not under the influence of cocaine during the incident and that there was reasonable doubt about premeditation.
The State's psychiatrist, Dr. Sprehe, testified in rebuttal that Whitfield was able to form a specific intent to commit murder, pointing out that Whitfield was arrested within two hours of the incident and was not considered to be intoxicated at that time. Further, he stated that Whitfield's actions during the course of the crimes showed planning ability: He entered the house, obtained a kitchen knife, used the knife to rape Brooks, threatened Brooks not to make noise, entered another room to kill Reynolds, left the house, and disposed of the knife. He also stated that cocaine psychosis resulting from long-term use of cocaine does not go away in a matter of hours.
Whitfield was convicted of armed burglary, sexual battery with a deadly weapon, and first-degree murder.
During the penalty phase, evidence was admitted regarding Whitfield's prior aggravated battery convictions. Testimony was presented that during both of the prior aggravated batteries Whitfield threatened to kill the victims if they called police. Whitfield presented evidence to show that he had recently been shot and severely wounded but that he forgave his assailant; that he was chronically dependent on drugs; that he suffers from major depression; that he suffered from a deprived childhood; that he was mentally ill and under the influence of crack cocaine when he entered Reynolds' home; *3 and that he was not in complete control of his emotions at the time of the murder.
The jury recommended death by a seven-to-five vote. The trial judge followed the jury's recommendation. He found three factors in aggravation: prior violent felonies (two prior aggravated batteries and contemporaneous sexual battery of another victim in this case); commission in the course of a burglary; and that the murder was heinous, atrocious, or cruel. He found no statutory mitigating circumstances, but he found the following nonstatutory circumstances: cooperation with authorities (little or no weight); impoverished background (considerable weight); crack cocaine addiction (substantial weight); Whitfield's abandonment by his father and his mother's alcoholism (some weight); and that Whitfield was the victim of a near fatal shooting but forgave his assailant (little or no weight).
In this appeal, Whitfield raises five issues. In his first issue, he contends that the trial judge wrongfully removed him from the courtroom during jury selection. The record reflects that, during jury selection, Whitfield indicated that he was dissatisfied with his attorneys and asked the trial judge to discharge them.[1] Apparently, Whitfield was angry that the only options, if he was found guilty, were a life sentence or death, and he contended that his attorneys had a "negative" attitude. The trial judge attempted to conduct both Nelson[2] and Faretta[3] inquiries on several occasions, but Whitfield was uncooperative in answering the judge's questions[4] and asked to be taken back to his cell. Whitfield's attorneys indicated that they were prepared to try the case and would represent Whitfield to the best of their ability. The judge found counsel to be competent and refused to discharge them. He also found that Whitfield was not competent to represent himself after Whitfield indicated that he could not think rationally, that he could not represent himself, and that the whole thing made his head hurt.[5] After that ruling, Whitfield again asked to be taken back to his cell, but the judge stated that Whitfield would remain in the courtroom as long as he behaved. Because he was not allowed to leave, Whitfield turned his chair around and sat with his back toward the jury. Whitfield's counsel then joined in Whitfield's request to allow him to be taken back to his cell because of the prejudice that would be caused to him by his sitting with his back to the jury. The judge again asked Whitfield if he wanted to leave and Whitfield's only response was that he was "not coming back." The judge allowed Whitfield to leave but stated that he would do whatever was necessary to ensure that Whitfield was able to participate, including placing a telephone in his cell. Whitfield refused this offer as well. After jury selection, the trial judge went to Whitfield's cell in an attempt to convince him to return to the trial. Whitfield chose not to return until some time later in the trial.
According to Whitfield, a defendant should never be removed from the courtroom unless he is unruly and disruptive or unless the trial judge specifically determines that the defendant has knowingly, voluntarily, and intelligently waived the right to be present. He asserts that, under the circumstances of this case, he did not knowingly, voluntarily, and intelligently waive that right. We have previously determined that a defendant may waive the right to be present in a capital *4 proceeding. Peede v. State, 474 So.2d 808 (Fla.1985). As noted by Whitfield, such a waiver must indeed be made knowingly, intelligently, and voluntarily. Francis v. State, 413 So.2d 1175 (Fla.1982). However, "[a] defendant will not be forced to attend his capital trial if his actions or the means used to ensure his presence would prejudice him in the eyes of the jury." Nixon v. State, 572 So.2d 1336, 1342 (Fla.1990). In this case, Whitfield repeatedly refused to answer the trial judge's questions and repeatedly told the judge he wanted to leave. The judge showed extraordinary patience and made every effort to keep Whitfield in the courtroom; however, Whitfield's counsel convinced the judge to grant Whitfield's request to leave because of the prejudice that could be caused by Whitfield's sitting with his back to the jury. Under these circumstances, we do not find that the trial judge abused his discretion in allowing Whitfield to leave. As we found in Ferry v. State, 507 So.2d 1373, 1375 (Fla. 1987), a defendant who voluntarily requests that he be removed from the courtroom, who knows that jury challenges will take place in his absence, and whose attorneys waive his presence will be deemed to have voluntarily, knowingly, and intelligently waived his presence and may not successfully claim reversible error on appeal on the basis that he was not present in the courtroom during jury selection.
In his next claim, Whitfield argues that testimony regarding the incident which occurred at Reynolds' house several weeks before the murder was improperly admitted at trial. As noted earlier in this opinion, several weeks before the murder, Whitfield was at Reynolds' house and asked Reynolds, Willie Mae Brooks, and Estella Pierre for money. He subsequently threatened to kill them when they refused to give him any money. Whitfield contends that evidence regarding this incident should not have been admitted at trial because it was offered solely to prove a prior bad act, took place nearly two weeks before the murder, and was irrelevant to the stabbing of Reynolds. Whitfield acknowledges that the admission of this evidence was harmless as to the guilt phase given the other evidence in this case. He argues, however, that this evidence prejudiced him in the penalty phase because it was a crime against women, ten of the jurors were women, and the death recommendation was only seven to five. We find no error in the admission of this evidence.
We have previously stated that evidence of prior bad acts or crimes is admissible if it is relevant to establish a material issue so long as the prejudicial nature of the evidence does not outweigh its relevance. Pittman v. State, 646 So.2d 167 (Fla.1994); Gorham v. State, 454 So.2d 556 (Fla.1984). We find that this evidence was not unduly prejudicial and was properly admitted to show evidence of premeditation and to explain why Willie Mae Brooks refused to allow Whitfield in the house on the night of the murder. See, e.g., Pittman (evidence regarding prior threats admissible to establish material issue).
In his third issue, Whitfield raises a number of claims in which he asserts that the prosecutor introduced irrelevant evidence or engaged in improper argument during the penalty phase.[6] The majority of these claims were not properly preserved for review and we do not find the errors, if any, to be fundamental. Upon reviewing the record, we conclude that those claims that were properly preserved did not constitute error when read in context or were harmless, even when considered cumulatively. See, e.g., Atwater v. State, 626 So.2d 1325 (Fla.1993) (error was harmless where trial judge erroneously permitted State on cross-examination to ask whether persons with antisocial personality showed remorse); Bertolotti v. State, 476 *5 So.2d 130 (Fla.1985) (sentence of death affirmed even though prosecutor clearly overstepped bounds of proper argument in commenting on defendant's silence, in making isolated golden rule argument, and in asking jury to consider message its verdict would send to community).
In his fourth claim, Whitfield contends that the trial judge improperly responded to a question posed by the jury during the penalty phase. The following question was posed by the jury during deliberations: "Does life in prison without parole really mean `no parole' under any circumstances. He will never be allowed back into society again?" Six jurors signed the question. Whitfield asked that an affirmative response be given to the question. The trial judge declined to give an affirmative response, choosing instead to reread the appropriate instruction to the jury.
Whitfield contends that the judge should have answered the question affirmatively based on the law and that, because six jurors asked the question, an affirmative answer could have changed the seven-to-five recommendation for death to a recommendation for life imprisonment. We disagree and find that the trial judge did not abuse his discretion when he reread this standard jury instruction. In Waterhouse v. State, 596 So.2d 1008 (Fla.1992), we were presented with a very similar situation wherein, during deliberations, the jury asked the trial judge the following question: "If he's sentenced to life, when would he be eligible for parole? Does the time served count towards the parole?" Rather than answering the question, the trial judge informed the jury that they would have to depend on the evidence and instructions. We concluded that the judge acted properly because the jury instructions adequately informed the jury that a life sentence carried a minimum mandatory sentence of twenty-five years. Similarly, the jury instruction in this case adequately informed the jury that the punishment is "either death or life imprisonment without the possibility of parole." We find that the trial judge acted appropriately in rereading the instruction to the jury.
Next, Whitfield argues that the trial judge failed to find certain factors in mitigation and failed to properly weigh the mitigating and aggravating circumstances. First, he contends that the trial judge failed to find the statutory mitigator of extreme mental or emotional disturbance. In evaluating this factor, the trial judge found as follows:
The only professional called to testify regarding mitigating circumstances was Dr. Eddie Regnier, Ph.D., a psychologist who specializes in treating addiction disorders. He spent a total of approximately 14 hours with the defendant. The majority of his testimony came from hearsay documents and interviews. No witnesses with direct evidence were called to testify. Dr. Regnier indicated he was unable to get very much information from the defendant because the defendant was uncooperative and "a poor historian."
Dr. Regnier testified that the defendant suffered from long standing major depression as a result of childhood deprivation. He was neglected and abused as a child; he lacked stability in his life and as a result became a cocaine addict.
In 1991, the defendant was committed under the Baker Act and held for a few days. The records were never produced. Dr. Regnier indicated that this commitment was the result of a cocaine binge.
It was further disclosed that in 1995, the defendant was involved in a shooting and was injured. From this incident he suffers a post traumatic stress disorder.
Even if the above facts were proven, which they weren't, they were not of the magnitude to cause an extreme mental or emotional disturbance which would rise to the level of this mitigator. If Dr. Regnier's second hand recounting of the defendant's unpleasant and deprived childhood is believable, it still does not prove the existence of this statutory mitigator; however, I do find and apply that evidence to non-statutory mitigators.

(Emphasis added.) Whitfield asserts that, in evaluating this factor, the trial judge erroneously concluded that Dr. Regnier's unrebutted testimony was not credible and that, at a minimum, it should have been considered as nonstatutory mitigation. As reflected by the *6 judge's findings, the conclusion he reached was that the evidence provided was primarily hearsay evidence that, even if true, would not rise to the level of statutory mitigation. Moreover, the judge specifically stated that he did find and apply this evidence as nonstatutory mitigation. We find no error.
Whitfield also argues that the trial judge failed to find as a statutory mitigating circumstance that Whitfield's capacity to conform his conduct to the requirements of the law was impaired. As to this mitigator, the trial judge stated:
Dr. Regnier testified both during the guilt and penalty phase regarding the defense of voluntary cocaine intoxication that the defendant was a crack cocaine addict and had been so for approximately nine years. It was alleged that the defendant used cocaine on the evening of the murder.
I believe that the defendant is a cocaine addict, and that he probably did use cocaine some time shortly before the murder. Dr. Regnier testified that a crack cocaine high or euphoric feeling lasts about 15 minutes. There is no evidence that the defendant smoked rock cocaine within 15 minutes of the murder. The evidence shows that the defendant was committing the rape of Willie Mae Brooks for at least 10 minutes before entering the bedroom of the deceased where he then spent at least 10 minutes. During the guilt phase, the same evidence was presented to the jury to nullify the existence of the specific intent necessary for pre-meditation, and the jury found beyond a reasonable doubt that it did not exist. The law enforcement witnesses who saw the defendant shortly after the incident testified that he appeared normal. There is no satisfactory evidence from which I find the existence of this factor. This mitigating factor does not exist.
Although the trial judge found that this mitigating circumstance did not exist, he did find as nonstatutory mitigation the following:
The defendant suffered from chronic crack cocaine addiction.
Although the evidence was not very definitive as to the nature and extent of the addiction, I find that this factor has been established. Had this been a crime to obtain money for drugs, this factor would be entitled to great weight. The commission of this murder had absolutely no relationship to the defendant's addiction; however, I do consider this an aspect of the defendant's background and character and in that regard, I give it substantial weight.
Whitfield maintains that the trial judge ignored evidence that the aftermath of a crack cocaine high results in a deep depression and that a person in this state becomes more irritable and can experience paranoid psychotic states.
The record reflects conflicting evidence as to Whitfield's state of mind at the time of the murder. For instance, Dr. Regnier testified that Whitfield was in a paranoid and hypervigilant state when he committed the homicide. However, during the guilt phase, the arresting officers described Whitfield as being very alert, seemingly without drug or alcohol problems, and able to lead officers to the murder weapon without difficulty. Additionally, Dr. Sprehe, the expert witness for the State, testified during the guilt phase that Whitfield was able to form specific intent. He concluded that Whitfield's actions during the course of the crimes showed planning ability given that Whitfield entered the house, obtained a kitchen knife, used the knife to rape Brooks, threatened Brooks not to make noise, entered another room to kill Reynolds, left the house, and disposed of the knife. Dr. Sprehe also stated that cocaine psychosis resulting from long-term use of cocaine does not go away in a matter of hours. In light of the contradicting evidence, we will not second-guess the trial judge's evaluation of this issue and rejection of the statutory mitigating circumstance of impaired capacity to conform conduct to the requirements of the law.
Finally, Whitfield argues that the trial judge erroneously gave great weight to the jury's recommendation of death because the recommendation was by a seven-to-five vote. This contention is without merit. As conceded by Whitfield this Court has previously rejected this argument in other cases. Thompson v. State, 648 So.2d 692 (Fla.1994); Brown v. State, 565 So.2d 304 (Fla.1990).
*7 Accordingly, we affirm Whitfield's convictions and sentences for armed burglary, sexual battery with a deadly weapon, and firstdegree murder, including the sentence of death for his first-degree murder conviction.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, GRIMES, HARDING, WELLS and ANSTEAD, JJ., concur.
NOTES
[1] The record indicates that Whitfield demanded, against the advice of his attorneys, speedy trial. Whitfield's attorneys had expressed to him the need for additional time to prepare for trial and to engage in plea negotiations with the State. Whitfield ignored their advice stating that he was dissatisfied with the possible option of two consecutive life sentences.
[2] Nelson v. State, 274 So.2d 256 (Fla. 4th DCA 1973).
[3] Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).
[4] Whitfield put his head down on the table and refused to talk to the judge or his attorneys.
[5] At this point in the proceedings, defense counsel also requested that Whitfield be subjected to a mental competency evaluation to ensure that he was competent to stand trial. The trial judge delayed the proceedings while Whitfield was evaluated by Dr. Regnier, who subsequently found Whitfield to be competent.
[6] Specifically, Whitfield argues that evidence of the sentences he received for prior violent felony convictions was improperly admitted and emphasized; that hearsay evidence that Whitfield threatened to kill the victims of the two prior aggravated batteries was improperly admitted; that the prosecutor wrongfully injected information in cross-examining the defense psychologist regarding Whitfield's community control; that the prosecutor wrongfully elicited information regarding remorse; that the prosecutor engaged in an improper "golden rule" argument; and that the prosecutor made gender-biased comments to sway the ten women jurors to vote for a death sentence in this case.