975 So.2d 1081 (2008)
Ryan Thomas GREEN, Appellant,
v.
STATE of Florida, Appellee.
No. SC06-211.
Supreme Court of Florida.
January 31, 2008.
*1082 Nancy C. Daniels, Public Defender, and W.C. McLain, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida, for Appellant.
Bill McCollum Attorney General, and Meredith Charbula, Assistant Attorney *1083 General, Tallahassee, Florida, for Appellee.
PER CURIAM.
Appellant, Ryan Thomas Green, was convicted of several serious crimes arising from one incident: first-degree murder for the shooting death of James Hallman; attempted first-degree murder for the shooting of Christopher Phipps; and robbery while carrying a firearm for stealing Phipps's car. He was sentenced to death for the first-degree murder conviction and life in prison for the attempted murder and robbery convictions. He appeals his sentence. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Based on the substantial mental health mitigation presented  including evidence that for years Green has suffered from schizophrenic disorders, we vacate the death sentence and remand the case for the imposition of a sentence of life imprisonment without the possibility of parole.

I. THE FACTS AND PROCEDURAL HISTORY
As always, we review the facts in the light most favorable to upholding the jury's verdict and the trial court's findings. See Hertz v. State, 803 So.2d 629, 646 (Fla.2001) (noting that all conflicts in the evidence and reasonable inferences therefrom are resolved in favor of sustaining the verdict on appeal); Shapiro v. State, 390 So.2d 344, 346 (Fla.1980) (noting that the trial court's factual findings are clothed with a presumption of correctness, and the evidence must be interpreted in the light most favorable to upholding the trial judge's conclusions). We note, however, that in determining Green's sentence the trial court found all three statutory mitigating factors related to mental health: that Green was under the influence of extreme mental and emotional disturbance; that his capacity to conform to the requirements of the law was substantially impaired; and that he acted under extreme duress or under the substantial domination of another person. We therefore review the facts with those findings in mind.
The Shootings
In the days before the shootings, Green and a childhood friend visited the home of Henry Cecil. Cecil lived with his nephew, Christopher Phipps. The four men sat around a dining room table. While doing paperwork at the table, Cecil opened a briefcase containing a handgun. Green noticed the firearm and commented about it to his friend. Green and his friend left shortly thereafter.
On the morning of the murder, Green walked out of his mother's apartment, where he was living at the time, and walked to Cecil's home. He knocked on the door and Phipps invited him in. Phipps asked if Green wanted a glass of water. Green said yes. As Phipps left to the kitchen, Green walked to Cecil's bedroom. In the bedroom, Green noticed Cecil's handgun and briefcase and grabbed them. He returned to the living room, where he encountered Phipps. Green pointed the gun at Phipps's head and demanded the keys to his car  a white Ford Thunderbird. After Phipps gave him the keys, Green shot him in the head. He fled in Phipps's car.
A short time later, Cecil was returning to his house and noticed Phipps's Thunderbird. Cecil realized that Phipps was not the driver and followed the vehicle. After a 20- to 25-minute pursuit, Green eluded Cecil. Cecil then returned home, where he found Phipps lying on the living room floor with a severe head wound (he miraculously survived). Cecil also noticed that his gun and briefcase were missing.
*1084 Meanwhile, having eluded Cecil, Green continued driving and eventually reached Kingsfield Road. Along the road he encountered James Hallman, a retired police officer who was taking his daily walk. He was dressed in a maroon shirt, blue jeans, and a University of Alabama baseball cap. Green saw Hallman walking and drove past him to the end of the road. With Cecil's handgun, Green shot a bull grazing in a nearby pasture.
After shooting the bull, Green turned around and drove back down Kingsfield Road. He approached Hallman and asked him for directions. As Hallman leaned forward toward the car window, Green shot Hallman in the head and drove off. Hallman was discovered shortly thereafter by a family on their way to church. He was airlifted to a hospital and remained in a coma for a week before dying.
At around noon that day, Green returned to his mother's apartment. His brother, Aaron Green, was there with his girlfriend and a friend, Brian Lockwood. Green spoke with Lockwood, took Lockwood downstairs, and showed him the white Thunderbird. He admitted to Lockwood that he had killed two people.
Green then went inside the house and spoke with his brother. He showed his brother the suitcase and gun he had taken from Cecil's house. He admitted shooting Phipps, stealing his car, shooting the bull, and shooting Hallman.
At about 7 p.m. that evening, Green was arrested. Police found Cecil's pistol in his apartment.
Before trial, the circuit judge determined that Green was incompetent to stand trial and committed him to a mental health facility where he received treatment until October 26, 2004, when the court found him competent to proceed.
The Evidence at Trial
At trial, Green claimed insanity as a defense. He presented the testimony of his mother, his brother, and two mental health experts. Green's mother testified that at the age of thirteen Green had been diagnosed with clinical depression and that he had threatened suicide several times. Green's school helped his mother seek treatment from a child psychologist, but Green refused to cooperate. He was prescribed Prozac for his depression, but after several months he stopped taking it. At around age 15 or 16, Green began experimenting with illegal drugs. Between the ages of 15 and 17, Green's mother noticed that he suffered from personality issues. He was later diagnosed with impulse control disorder.
When Green was 16, he was sent to live with his father in Mississippi. At first, he was happy. The situation eventually deteriorated, however, and Green moved back in with his mother. In the following weeks, he exhibited angry and unusual behavior. He heard voices, locked himself in his room, and planted his mother's jewelry in potting soil to grow crystals. During this time, Green was not being treated for mental illness and was not taking any medication.
At one point, Green disappeared for three days. He was found by police in another county without identification. About four months before the shootings, Green was involuntarily committed to the Crisis Stabilization Unit at the Lakeview Center, where he remained for a few weeks. While there, he was prescribed medication to treat his mental illness. After he left, he had a follow-up appointment scheduled but refused to see the doctor.
Shortly after leaving the facility, Green turned violent. His mother testified that Green threw glass at her and destroyed her dining room set. He also carved a *1085 picture of a brain onto the seat of a chair. The carving included strange labeling and nonsensical equations. Green's mother and brother were fearful of him. Green would stay up for days locked in his room praying and speaking to entities no one else could see. Green also told his mother that God had given him a secret name no one knew about.
A few days before the murder, Green asked his uncle to cosign a loan for the purchase of a car, but his uncle refused. The family did not want Green having access to a car because he had driven off many times from a local gas station without paying for the fuel. Green had told his mother that he was the son of God and the station attendant knew he did not have to pay for the gas.
Green responded angrily to his uncle's denial. According to Green's mother, "he just absolutely snapped." He sat in the kitchen and banged his head against the wall. He was "ranting and raving, screaming and crying, slinging and breaking things, crying, and crying."
Green's brother Aaron also testified about Green's behavior during the months before the shootings. Aaron testified that in the spring of 2002 Green told him he could read minds. Green also said his hand was the devil's hand. Aaron testified that Green routinely smoked marijuana and took ecstasy.
Green testified in his own defense. He stated that he began taking ecstasy in December 2001 and that was when he first started hearing voices. He stated that his drug use increased once he returned to live with his mother. He would self-medicate with marijuana and ecstasy to quiet the voices in his head and cope with his depression. He believed he could read minds and body language. On the Wednesday before the shootings, Green was fired from his job. He testified that this partially motivated his breakdown two days later, when his uncle refused to cosign the loan for a car. Green said that at this point he felt suicidal and wanted to die so he could go to heaven.
Green admitted walking to Cecil's house on February 23, 2003, retrieving the gun from Cecil's bedroom, and shooting Phipps in the head. He testified that he was hearing voices during this time. He also admitted driving off in Phipps's car, encountering Hallman, and shooting the bull. Green testified that after he shot the bull, it turned around and said, "I love you," and he responded by saying, "I love you too." During this time Green stated that he wanted to kill himself and that he felt he was the devil.
Green testified that he then drove back up the road and asked Hallman for directions. Green said he believed the "A" on the front of Hallman's University of Alabama hat stood for the "Antichrist." Green also said he interpreted Hallman's body language as indicating that he wanted to die and that he heard a voice that told him Hallman wanted to be killed. Green admitted that as soon as Hallman leaned his head forward, Green shot him.
Three psychological experts testified during the guilt and penalty phases  Drs. James Larson and Brett Turner for the defense, and Dr. Lawrence Gilgun for the State. They testified that Green had a history of intermittently treated mental illness and that he was psychotic on the day of the shootings. All the doctors agreed that Green was suffering from an untreated schizoaffective disorder. Dr. Larson testified that he was unable to determine whether Green was legally sane when he committed the shootings. Dr. Turner said he believed Green was sane when he shot Phipps, but could not be certain whether he was sane at the time he shot Hallman. *1086 Dr. Gilgun testified that he believed Green was sane during both shootings. The jury rejected Green's insanity defense and found him guilty on all counts.
During the penalty phase, the defense presented extensive mental health mitigation through several witnesses: Green's guidance counselor, two expert witnesses (Drs. Larson and Turner) and most notably the State's expert psychologist, Dr. Gilgun. Dr. Gilgun agreed that both statutory mental health mitigators applied: that at the time of the killing, Green was under the influence of extreme mental and emotional disturbance; and that his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired. Nevertheless, the jury recommended death by a vote of ten to two.
After a Spencer[1] hearing, the court followed the jury's recommendation. The court found two aggravating circumstances: (1) Green had been contemporaneously convicted of another violent felony; and (2) Hallman's murder was committed for the purpose of avoiding or preventing a lawful arrest. The trial court also found four statutory mitigators: (1) Green had no significant history of prior criminal activity; (2) the murder was committed while Green was under the influence of extreme mental and emotional disturbance; (3) Green's capacity to conform to the requirements of the law was substantially impaired; and (4) the defendant acted under extreme duress or under the substantial domination of another person. In addition, the court found three nonstatutory mitigators: (1) the defendant's mental illness was brought to the attention of the family and school authorities years before this incident and yet he received no significant assistance (substantial weight); (2) during the time that the circumstances giving rise to this prosecution were committed, the defendant had significant problems with drug abuse, and these problems were the result of his mental illness (substantial weight); and (3) since his arrest, the defendant has not been a disciplinary problem and has not engaged in any violent acts (moderate weight).
The trial court sentenced Green to life in prison for the attempted murder and robbery convictions, and imposed the death penalty for the murder of Hallman. This appeal followed.

II. ISSUES ON APPEAL
Green raises four issues on appeal. Because we reverse Green's sentence, we only address the following two claims: (1) that the trial court erred in finding the avoid arrest aggravator; and (2) that the death sentence is disproportionate.[2]

1. Avoid Arrest Aggravator
Green challenges the trial court's finding of the statutory "avoid arrest" aggravator. See § 921.141(5)(e), Fla. Stat. (2005) (providing as an aggravating factor that the capital felony was "committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody."). He contends that the avoid arrest aggravator is not supported by competent substantial evidence. We agree.
When Green shot the victim, James Hallman, he was unaware that Hallman was a retired police officer. Therefore, to establish that the murder was committed *1087 to avoid arrest, the State was required to prove beyond a reasonable doubt that eliminating Hallman as a witness was the dominant or only motive for murdering him. See Reynolds v. State, 934 So.2d 1128, 1157 (Fla.2006) ("[T]o establish the avoid arrest aggravating factor where the victim is not a law enforcement officer, the State must show beyond a reasonable doubt that the sole or dominant motive for the murder was the elimination of a witness.") (quoting Bell v. State, 841 So.2d 329, 336 (Fla.2002)). When the victim is not a law enforcement officer, proof of intent to avoid arrest and detection must be very strong. See Jones v. State, 963 So.2d 180, 186 (Fla.2007) (citing Riley v. State, 366 So.2d 19, 22 (Fla.1978)).
In reviewing aggravating factors, we do not "reweigh evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt. . . . Rather, our task . . . is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding." Willacy v. State, 696 So.2d 693, 695 (Fla.1997). We conclude the avoid arrest aggravator is not supported by competent, substantial evidence.
To support the avoid arrest aggravator, the State argued that Green's dominant, if not sole, motive for killing Hallman was to eliminate him as a witness to the discharge of the firearm and the shooting of the bull. While the State's theory is possible, it is equally plausible that Hallman's murder had nothing to do with witness elimination, but rather was the product of Green's mental illness, which included psychotic episodes, delusions, and hallucinations.
The trial court found that when Green killed Hallman, he was under the influence of extreme mental and emotional disturbance. Consistent with this finding, Green testified that God motivated him to kill Hallman. He felt God put him there, on that day, to kill Hallman because Hallman was the Antichrist. Green thought Hallman was the devil and Green was put there to relieve Hallman of his burden.
The trial court also recognized two other motivations for Hallman's murder. The trial court acknowledged record evidence that Green was motivated to kill Hallman in self-defense when Hallman became agitated, or because he wanted to eliminate Hallman as a witness to his own suicide.
Thus, while the evidence reflects that Green may have had several motives for killing Hallman, it does not support a finding that Green's dominant motive was to avoid arrest. Cf. Hurst v. State, 819 So.2d 689 (Fla.2002) (reversing a finding of the avoid arrest aggravator because the evidence failed to demonstrate that the dominant motive for the murder was to avoid arrest); Connor v. State, 803 So.2d 598, 610 (Fla.2001) (finding that the avoid arrest aggravator was not supported by competent substantial evidence because it was entirely plausible that witness elimination had nothing to do with the murder). Accordingly, we conclude that the trial court erred in finding the avoid arrest aggravator.

2. Proportionality
Green next claims that his death sentence is disproportionate. We agree, and therefore reverse the sentence of death.
Proportionality review is a unique and highly serious function of this Court. See Urbin v. State, 714 So.2d 411, 416 (Fla.1998). In carrying out this important task, we are mindful that death is a punishment "reserved only for those circumstances where the most aggravating and the least mitigating circumstances exist." Terry v. State, 668 So.2d 954, 965 *1088 (Fla.1996). When conducting a proportionality review, we consider the totality of circumstances and compare each case with other capital cases. See Crook v. State, 908 So.2d 350, 356 (Fla.2005). Proportionality review is not a comparison between the number of aggravating and mitigating circumstances. Id.
Without the avoid arrest aggravator, Green's death sentence rests on a single aggravating circumstance: that Green had been contemporaneously convicted of another violent felony  the attempted murder of Phipps. See § 921.141(5)(b), Fla. Stat. (2005). The trial court also found substantial mitigation, however. The court found that: (1) Green had no significant history of prior criminal activity; (2) the murder was committed while the defendant was under the influence of extreme mental and emotional disturbance; (3) the defendant's capacity to appreciate the criminality of his conduct or to conform to the requirements of the law was substantially impaired; and (4) the defendant acted under extreme duress or under the substantial domination of another person. The trial court also found three nonstatutory mitigators.
As we have previously explained, absent unusual circumstances, "`death is not indicated in a single-aggravator case where there is substantial mitigation.'" Almeida v. State, 748 So.2d 922, 933 (Fla. 1999) (quoting Jones v. State, 705 So.2d 1364, 1367 (Fla.1998)); see also Offord v. State, 959 So.2d 187, 191-92 (Fla.2007) ("[W]e have also explained that `[a]s a general rule, "`death is not indicated in a single-aggravator case where there is substantial mitigation.'"'"); Rodgers v. State, 948 So.2d 655, 670 (Fla.2006) ("We have stated that generally a death sentence is not proportionate when supported by a single aggravator and the mitigation is substantial."), cert. denied, ___ U.S. ___, 128 S.Ct. 59, 169 L.Ed.2d 50 (2007). The vast majority of cases where we have upheld a death sentence based on a single aggravator have involved a prior murder or manslaughter. See, e.g., Rodgers, 948 So.2d at 655 (finding the death sentence proportionate even though it was supported by a single aggravator  prior violent felony conviction  where that aggravator included a robbery and a similar shooting and killing offense); Ferrell v. State, 680 So.2d 390 (Fla.1996) (affirming a death sentence where the sole aggravator was a prior second-degree murder); Duncan v. State, 619 So.2d 279 (Fla.1993) (affirming a death sentence where the sole aggravator was a prior second-degree murder). Although the shooting of Phipps was a very serious crime, it (fortunately) did not result in Phipps's death. Thus, in light of the substantial mitigation, Green's single-aggravator murder does not warrant a death sentence.
Even if we upheld the avoid arrest aggravator, however, we would reach the same conclusion based on the substantial and uncontroverted evidence of the defendant's mental illness. We have consistently recognized such mitigation as among the most compelling. See, e.g., Morgan v. State, 639 So.2d 6, 14 (Fla.1994) (reducing a death sentence to life despite the trial court's finding that rage and mental infirmity did not play a major role in the crime); Knowles v. State, 632 So.2d 62, 67 (Fla.1993) (reversing the trial court's rejection of this factor and reducing the sentence to life given evidence of the defendant's organic brain damage, psychotic state, and neurological deficiencies); Carter v. State, 560 So.2d 1166, 1168-69 (Fla. 1990) (reducing the death sentence to life based on the defendant's organic brain damage, increased impulsiveness, diminished ability to plan events, and a psychologist's testimony that the defendant *1089 "probably" was unable to appreciate the criminality of his conduct).
Green has a history of intermittently treated mental illness dating back to at least age 13. The trial court accurately described Green's life after age 13 as "a psychological, emotional, and antisocial free fall into an abyss of aberrational, delusional and psychotic behavior." Green was diagnosed as suffering from depression, impulse control disorder, and schizoaffective disorder. He refused to treat his illness and instead resorted to marijuana and ecstasy to quiet the voices in his head and cope with his depression. Shortly before committing these crimes, Green was involuntarily committed and placed in a crisis stabilization unit. Between the time he left that unit and the shootings, his mental health significantly deteriorated. In fact, all three mental health experts agreed, and the trial court found, that during the shootings "he was fully immersed in a drowning pool of mental illness." Therefore, we find that without question Greens mental health significantly contributed to the murder.
In comparable cases involving extensive mental health mitigation, we have found the death sentence disproportionate. See Offord, 959 So.2d at 187 (reducing the defendant's sentence to life based on extensive mental mitigation despite a finding of the heinous, atrocious, and cruel (HAC) aggravator); Larkins v. State, 739 So.2d 90 (Fla.1999) (vacating the death sentence because the significant mental health mitigation outweighed the prior violent felony and pecuniary gain aggravators); Kramer v. State, 619 So.2d 274 (Fla.1993) (vacating a death sentence supported by HAC and prior violent felony aggravators based on strong mitigation evidence).[3] Similarly, we find imposition of the death penalty disproportionate here. By doing so, we do not minimize the seriousness of the murder Green committed. Our holding recognizes that, while Green clearly has committed a crime that is by definition heinous, and therefore must spend the rest of his life in prison, because of the substantial *1090 mental health mitigation involved when compared to other cases of murder, his case does not constitute one of the most aggravating and least mitigated so as to deserve a sentence of death.
For the reasons stated, we reverse Green's sentence of death and remand the case to the trial court for imposition of a sentence of life without the possibility of parole.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Spencer v. State, 615 So.2d 688 (Fla.1993).
[2] Our reversal of Green's death sentence renders moot the remaining claims: (1) whether the trial court erred in denying Green's penalty phase motion for mistrial; and (2) whether Florida capital sentencing statue is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
[3] See also Crook, 908 So.2d at 350 (finding the death sentence disproportionate, despite substantial aggravation, where the mental health mitigation was overwhelming); Hawk v. State, 718 So.2d 159, 163-64 (Fla. 1998) (finding the death sentence disproportionate despite substantial aggravation, including the contemporaneous attempted murder of a separate victim, where the mental health mitigation was substantial); Urbin, 714 So.2d at 417-18 (finding the death sentence disproportionate despite multiple aggravators, including a prior violent felony, where the mitigation included the defendant's impaired capacity, deprived childhood, and youth); Robertson v. State, 699 So.2d 1343, 1347 (Fla. 1997) (finding the death sentence disproportionate where HAC and other aggravation was offset by the mitigating factors of age, impaired capacity, childhood abuse, and mental mitigation); Morgan v. State, 639 So.2d 6, 14 (Fla. 1994) (finding the death sentence disproportionate despite HAC and other aggravation where copious mitigation included brain damage and the defendant's youth); Knowles, 632 So.2d at 67 (finding the death sentence disproportionate despite a contemporaneous murder aggravator where substantial mitigation included the defendant's brain damage and impaired capacity); Nibert v. State, 574 So.2d 1059, 1062-63 (Fla. 1990) (finding the death sentence disproportionate where the HAC aggravator was offset by the defendant's abused childhood, extreme mental and emotional disturbance, and impaired capacity due to alcohol abuse); Livingston v. State, 565 So.2d 1288, 1292 (Fla.1988) (finding the death sentence disproportionate where the aggravators  a prior violent felony and murder committed during a robbery  were offset by the defendant's severe childhood abuse, youth and immaturity, and diminished intellectual functioning); Miller v. State, 373 So.2d 882, 886 (Fla. 1979) (finding the death sentence disproportionate despite substantial aggravation, including HAC, where the mental mitigation was substantial and related to the crime).