PER CURIAM.
Raymond Bright appeals his convictions for first-degree murder and his sentences of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the convictions and sentences.
FACTS AND PROCEDURAL HISTORY
On February 18, 2008, Michael Majors went to the home of fifty-four-year-old defendant Raymond Bright in Jacksonville, Florida. Twenty-year-old Derrick King, sixteen-year-old Randall Brown, and Bright were in the house. At approximately 8 p.m., Majors and Brown both left the home.
Brown returned to his mother’s home and, after receiving a phone call, borrowed his mother’s rental vehicle and left her house between 9 and 9:30 p.m. At approximately 11 p.m., Brown spoke with his mother by phone and advised that he would be home shortly; however, he never returned. At around 8 a.m. the next morning, Majors attempted to call Brown on his cellular phone, but there was no answer. Majors called Brown’s mother and was advised that Brown had not returned. Majors then went to Bright’s house and, having no response to his knock at the door, Majors climbed into the house through an open window. Upon entering the family room, Majors discovered the bodies of King and Brown.
Derrick King was lying face down on the carpet next to a sofa, partially wrapped in a sleeping bag or comforter. The sofa was saturated with blood on one end, which was adjacent to where King’s head rested on the floor. The wall behind the sofa and the ceiling above the sofa evidenced blood. An evidence technician testified during trial that the blood on the ceiling was cast-off blood,[1] and the pattern was consistent with someone being on the couch and swinging his arm back.
Randall Brown was found seated sideways in a recliner with his head leaning up against a wall and a blanket covering his head. The wall against which Brown’s body rested presented a pattern of blood that radiated from his head, and there was also blood on the ceiling. When crime scene technicians moved the recliner away from the wall, a pool of blood was discovered on the floor. Above Brown’s head was a framed picture with one side of the frame broken away. That one side was indented, consistent with having been struck by something round, such as a hammer.
Outside the house, the crime scene technicians located a loaded nine-millimeter Smith & Wesson pistol, a loaded assault rifle, and a pair of mechanic’s gloves. During a subsequent search of Bright’s yard, technicians recovered a hammer that had been buried. DNA testing on the hammer revealed two separate DNA profiles, one of which was a major contributor and the other of which was a minor contributor. During trial, the parties stipulated that the DNA of the major contributor matched the known profile of Derrick King. Randall Brown could not be excluded as the minor contributor. The gloves did not test positive for blood. Further, no latent fingerprints of value were found on the hammer, the nine-millimeter hand *253 gun, the assault rifle, or their magazines or ammunition. No foreign DNA was detected on the fingernail clippings of either victim.
At 7:80 a.m. on the morning of February 19 (the day that the victims were discovered), Bright’s ex-wife picked him up at a church near his home. The ex-wife testified that she and Bright had made plans to secure the admission of Bright to a United States Department of Veterans Affairs clinic for treatment of his cocaine addiction. She testified that they had agreed to meet at the church because she “was in fear of what was going on” at Bright’s house. During the Spencer hearing, see Spencer v. State, 615 So.2d 688 (Fla.1993), the ex-wife testified that she and Bright had previously made multiple calls to law enforcement — including the narcotics division of the Jacksonville Sheriffs Department and Crime Stoppers — to report that Bright wanted certain individuals removed from his house because they had essentially taken over the house for the purpose of selling drugs. While one officer suggested that Bright accompany the police to the house and identify the persons who were allegedly dealing drugs, Bright and his ex-wife refused to agree to this proposal because they feared retaliation.[2]
After the ex-wife met Bright at the church on the morning of February 19, she called a lawyer and arranged for Bright to speak with homicide detectives the next day. However, at 1:45 a.m. on February 20, law enforcement arrived at the home of the ex-wife and Bright was placed in custody. Subsequent to the arrest, the ex-wife disposed of Bright’s bloody clothes because she did not want them in her house.
Bright made statements to separate individuals with regard to what allegedly occurred on the night of the murders. Prior to his arrest, Bright informed friend and former coworker Benjamin Lundy that he had “screwed up” and may have killed two people. Bright told Lundy that the murders occurred after a confrontation erupted when one of the victims accused Bright of stealing drugs. After his arrest, Bright also described the events to Mickey Graham, who was in jail at the same time with Bright on unrelated charges. According to Graham, Lavelle Copeland had moved in with Bright, and he and others were running a crack cocaine operation out of the house.[3] Bright was afraid of them and felt threatened because they possessed guns. Bright did not want them there and had called the police in an attempt to remove them from the premises.
Bright told Graham that he went into the kitchen at 2 a.m. on February 19. King was on the sofa and Brown was in the recliner. Brown had a nine-millimeter *254 handgun in his hand and started waving it around. King rose from the sofa and removed the gun from Brown’s hand. Bright saw an opportunity and attempted to take the gun away from King. The men struggled and the gun discharged.[4] The gunshot startled King and caused him to release the handgun. Bright then pointed the gun at King and attempted to shoot him, but the gun misfired. Bright dropped the weapon and attempted to run out of the house, but he tripped and fell. He grabbed a hammer that was within reach, turned around, and commenced striking King, knocking him back toward the sofa where King had previously been lying down. When Bright turned around, he saw that Brown was about to pick up the handgun. Bright then began to strike Brown with the hammer. The next time Bright turned toward the sofa, he saw King reaching for an assault rifle. At that time, Bright again struck King with the hammer. When Bright stopped, he could still hear King and Brown breathing and gurgling, but then the room became silent. Bright described his actions to Graham as having “lost it.”
The autopsies of King and Brown were conducted by different medical examiners. However, both independently concluded that each victim died from blunt impact trauma to the head. King was struck thirty-eight times about the neck and head, and twenty additional times on his body, for a total of fifty-eight individual injuries. The wounds were consistent with a hammer-type instrument, and injuries were present on the front, back, top, left, and right sides of King’s head. Further, the injuries to his body were consistent with defensive wounds. The medical examiner testified that the injuries were consistent with King defending himself against being hit in the head with a hammer and eventually succumbing to the attack. Toxicology results were positive for cocaine and marijuana in King’s system.
Brown’s skull was fractured in eight to ten separate locations, and he also received fourteen other independent injuries to his body. The injuries to the body, which included a fractured ulna, were consistent with defensive wounds. Based upon the number of injuries to Brown’s body, the medical examiner opined that the attack was not brief, but lasted for minutes. Based on the nature of the defensive wounds, the medical examiner concluded that the only injury that would have been fatal on its own, and would have rendered Brown unconscious immediately — a depressed skull fracture — could not have been the first injury inflicted. The medical examiner testified that all of the injuries inflicted upon Brown would have been painful, and they were consistent with a scenario in which Brown was either sitting in a recliner, or fell back onto a recliner, and was repeatedly hit with a hammer as he tried to defend himself. No alcohol or drugs were detected in Brown’s system. The jury found Bright guilty of two counts of first-degree murder.
During the penalty phase, the parties stipulated that in 1990, Bright was convicted of armed robbery. A Pensacola police sergeant testified that Bright was arrested *255 for robbing a convenience store while using a knife. During the robbery, Bright leaned over the counter in an attempt to remove money from the register, but he never went behind the counter. The State also introduced victim impact statements from Randall Brown’s mother, aunt, and sister, and Derrick King’s grandmother, cousin, and sister.
Bright presented the testimony of his sister, Janice Jones, who stated that Bright and another brother had taken care of her when she was young. Bright had also stepped in and served as the father that her daughter never had. She testified that Bright repaired the roof on her house and saved her $3000 after Hurricane Ivan caused damage. There was an eighteen-month waiting list for roofers when Bright performed the repairs.
Attorney and former marine James Hernandez testified that Bright served nine-plus years in the United States Marine Corps (USMC), during which he served as a fighter jet mechanic. Hernandez described Bright’s multiple promotions during his service in the USMC. Hernandez testified that Bright received two separate awards for good conduct, a prerequisite of which is three continuous years of honorable service in the USMC. Hernandez also explained that Bright received a Meritorious Mast Award for noticing a problem on a jet upon take-off which required it to land, thereby preventing a “tragic mishap.” Bright received two separate honorable discharges from the USMC, and one general discharge under honorable conditions. The reason for the general discharge was listed as “Alcohol Abuse Rehabilitation Failure.”
Bright’s girlfriend and two of his former coworkers, Benjamin Lundy and Brian Williams, testified that Bright struggled with drugs and alcohol. The girlfriend stated that when she first met Bright, he was smart, intelligent, hardworking, and clean. However, in November and December of 2007, she noticed that he was continuously fatigued and no longer wanted to do anything. She stated that “[ajfter the drugs took him over he couldn’t do nothing, his whole life was just gone.” The girlfriend testified that when Bright was away from his house, he wanted to seek assistance and clean up his life. However, she observed that as soon as he returned to the house, “that was it.” Brian Williams testified as to one incident where Bright’s ex-wife called and asked him to come to her house to check on Bright. When Williams arrived, Bright was intoxicated and upset, and he threatened suicide. Williams contacted the police, who responded and spoke with Bright, but then left. Lundy testified that he suspected Bright was involved in something more serious than alcohol when Bright started to miss work, which was out of character for him. In addition to being coworkers, Williams and Lundy also considered Bright to be a friend. Lundy stated that when he or anyone else needed help, Bright was always available. Bright helped Williams surprise his children one Christmas by bringing the children the bicycles that Williams had previously hidden.
Lester Baker, who supervised Bright at a mattress manufacturing company during the early 1990s, and Lundy and Williams, who previously worked with Bright at a commercial diesel truck shop, testified that Bright was likable, dedicated, and a hard worker. Lundy and Williams stated that Bright mentored young mechanics and would often volunteer to stay late to complete a project but not charge the shop for the time. They also testified that Bright never appeared to be under the influence of drugs or alcohol while at work.
Finally, Bright presented the testimony of the records custodian of the Jacksonville *256 Sheriffs Office jail, who established that there was no record of any disciplinary reports for Bright.
On September 1, 2009, the jury recommended by a vote of eight to four that Bright be sentenced to death for the murders of Derrick King and Randall Brown.
During the Spencer hearing, in addition to the previously discussed testimony of Bright’s sister and his ex-wife, Bright presented the testimony of Dr. Ernest Miller, who diagnosed Bright as suffering from substance abuse along with a dependency problem involving alcohol and cocaine. Miller noted that there was a history of alcohol abuse in the Bright family, which made Bright five to eight times more likely to develop a substance abuse problem. Miller testified that during Bright’s various attempts in rehabilitation, his addiction issues were treated, but the underlying emotional issues were not. Therefore, only half of the problem was addressed, and Bright would thereafter go through the “revolving door” of alcoholism. Miller stated that Bright’s extensive criminal history — at least twenty-five convictions — appeared to be connected with feeding his drug habit. While Bright asserted to Miller that he acted in self-defense when he killed King and Brown, Miller explained that use of alcohol and cocaine could have caused Bright to be paranoid and led him to believe that the victims intended to harm him even if they did not.
Bright’s sister, Janice Jones, testified that their father was a binge drinker who would disappear for several days at a time. She first noticed Bright’s drinking problem when he was discharged from the marines. She believed that he became involved with cocaine after a trip to North Carolina, when an attempt to reconcile with his wife failed. Jones testified that when Bright is sober, he is “amazing,” but when he drinks or is on drugs, she does not like him, and he does not like himself.
Attorney James Hernandez, who briefly represented Bright in these proceedings, and attorney Michael Bossen, whom Bright and his ex-wife called the morning after the murders, both testified that Bright was remorseful and cried when he tried to recount the events surrounding the murders. Bossen also related what Bright told him:
That these people were dealing drugs out of the house. That they paid the rent in drugs, some money but mostly drugs.... [Bright] was threatened all day the day before the killings. And then he was — he himself was threatened, that they were threatening to kill him if he didn’t basically comply with whatever they were doing. So he basically told me that he tried to get them out and whenever he tried to get them out they threatened him, there were guns.... And then basically he said that between 5:00 and 7:00 [a.m.] there was an altercation, he used the hammer to defend himself, the hammer was still in the house. And that he believed that he as a former marine he fought to eliminate that threat.
Finally, a letter from inmate Charles Ferguson was placed in evidence. In the letter, Ferguson stated that Bright had taught him how to read and write, and about God. He also stated that Bright had become a father figure to him.
On November 19, 2008, the trial court sentenced Bright to death for the murders of King and Brown. The court found the same aggravating and mitigating circumstances for each victim. In pronouncing Bright’s sentence, the trial court determined that the State had proven beyond a reasonable doubt the existence of the following statutory aggravators: (1) He had previously been convicted of a felony involving the use or threat of violence to the person, § 921.141(5)(b), Fla. Stat. (2008) (the 1990 conviction for robbery) (great *257 weight); (2) He had previously been convicted of a felony involving the use or threat of violence to the person, § 921.141(5)(b), Fla. Stat. (2008) (the contemporaneous murder of the other victim) (great weight); and (8) the murder was especially heinous, atrocious, or cruel (HAC), § 921.141(5)(h), Fla. Stat. (2008) (great weight).
The trial court found that one statutory mitigating circumstance had been established — the murders were committed while Bright was under the influence of an extreme mental or emotional disturbance, § 921.141(6)00, Fla. Stat. (2008) (some weight). In support of this mitigating circumstance, the trial court relied on Dr. Miller’s testimony that Bright’s underlying emotional problems were never treated, and the testimony of Bright’s girlfriend and Brian Williams with regard to the changes in Bright’s behavior toward the end of 2007, including the threat of suicide.
The trial court also found nineteen non-statutory mitigating circumstances: (1) a long and well-documented history of drug abuse (some weight); (2) Bright repeatedly sought help for his problems (some weight); (3) remorse (little weight); (4) Bright was afraid of the victims and took steps to remove them from his house (little weight); (5) ten years of service in the USMC with two honorable discharges and a third discharge under honorable circumstances (considerable weight); (6) Bright has skills as a mechanic and served as an aviation mechanic in the USMC (some weight); (7) Bright’s actions as a USMC aviation mechanic likely saved lives (some weight); (8) Bright mentored young mechanics (some weight); (9) Bright was a good employee (some weight); (10) Bright was a loving and giving boyfriend (slight weight); (11) Bright is a good brother (some weight); (12) Bright was a good father, and imposition of the death penalty would have a serious, negative impact on others (slight weight); (13) Bright shares love and support with his family (slight weight); (14) Bright was a good friend (slight weight); (15) Bright has been an exceptional inmate (some weight); (16) Bright exhibited good behavior throughout the court proceedings (slight weight); (17) Bright maintained gainful employment (considerable weight); (18) Bright is amenable to rehabilitation and a productive life in prison (slight weight); and (19) Bright has bonded with another inmate and taught him how to read (slight weight).[5]
The trial court concluded that the established aggravating circumstances substantially outweighed the mitigating circumstances and imposed a sentence of death for each of the murders. However, the sentencing order noted that, had the HAC aggravating circumstance not been present, “this Court may have found a life sentence to be appropriate.” When pronouncing the sentencing in open court, the trial court further stated:
And Mr. Bright, I don’t mind telling you that I take no delight in imposing the [death] sentence^] in this case. Quite frankly, but for the heinous and atrocious and cruel aggravator in this case, I would not be imposing [the sentences] that I am going to impose.
This direct appeal followed.
ANALYSIS

Sufficiency of the Evidence

Although the issue is not raised by the parties, this Court has a mandatory *258 obligation to independently review the sufficiency of the evidence in every case in which a sentence of death has been imposed. See Blake v. State, 972 So.2d 889, 850 (Fla.2007); Fla. R.App. P. 9.142(a)(5). “In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Bradley v. State, 787 So.2d 732, 738 (Fla.2001) (citing Banks v. State, 732 So.2d 1065, 1067 n. 5 (Fla.1999)).
Sufficient evidence exists in the record here for the jury to convict Bright of first-degree premeditated murder. The record reflects that Bright admitted that he killed King and Brown with a hammer, and the injuries to the victims were consistent with being inflicted by such a weapon. Consistent with these facts, a hammer with the blood of the two victims on it was located in the backyard.
Although Bright contended that his actions were in self-defense, the photos of the crime scene are not consistent with and do not support Bright’s version of events. Instead, the images of King on the floor by the sofa partially wrapped in a sleeping bag or comforter, and Brown seated in a recliner covered by a blanket, suggest that the victims were sleeping or in repose at the time of the attack. Further, the cast-off blood on the ceiling, and the concentration of the blood on one end of the sofa and on the wall against which Brown’s body was found, indicates that the attacks were localized to the area where the victims’ bodies were found. This belies Bright’s assertion that the beatings occurred during a chaotic life-or-death struggle in the family room. Instead, the evidence is consistent with a scenario in which Bright waited until the victims were asleep, and then attacked them.

Improper Argument

In his first claim, Bright contends that during guilt phase closing statements, the prosecutor improperly commented upon Bright’s right to remain silent. The State asserts that this issue is not preserved for review because defense counsel failed to contemporaneously object to the allegedly improper statement. The relevant portion of the closing statement reads:
Keep in mind that the defendant had hours, 8 to 12 or so depending on when the crime occurred, to come up with a version of what he would tell happened in his home, plenty of time for him to come up with a story, a story that as I just told you does not match at all with the physical evidence.
[[Image here]]
The defendant cannot admit to you that it was planned. He can’t admit to his friends and family members that it’s planned, and yet he could not escape the crime .... The defendant couldn’t escape his actions, and yet he couldn’t admit the truth.
The brutal nature of this crime shows you the defendant’s intent. He told you a story through his friend and the inmate from the Duval County Jail, but that doesn’t mean that that’s what happened. That just means that’s what he said happened. It’s completely absurd when taken in light of the physical evidence found at the scene.
(Emphasis supplied.) After the prosecutor completed her closing statement, defense counsel objected and moved for a mistrial out of the hearing of the jury.
When asked to respond to defense counsel’s objection, the prosecutor stated that her comments were intended to convey to the jury that, despite the version of events that Bright told others, he would never admit that he intentionally murdered the *259 victims, even if he had actually done so. The court denied the motion for mistrial, concluding that the prosecutor only intended to explain Bright’s conversations with others, and the statements were not a comment on his right to remain silent. Defense counsel did not request, and the trial court failed to issue, a ruling on the objection.
Preservation — This Court has explained with regard to the preservation of claims of allegedly improper argument for review:
Ordinarily, to preserve a claim based on improper comment, counsel has the obligation to object and request a mistrial. If counsel fails to object or if, after having objected, fails to move for a mistrial, his silence will be considered an implied waiver. In connection with closing argument, a motion for mistrial need not be made in the next breath following the objection to the offensive remark. This rule avoids interruption in the continuity of the argument and affords defendants an opportunity to evaluate the prejudicial nature of the objectionable remarks in the context of the total argument. State v. Cumbie, 380 So.2d 1031, 1033 (Fla.1980).
... The requirement of a contemporaneous objection is based on practical necessity and basic fairness in the operation of the judicial system. A contemporaneous objection places the trial judge on notice that an error may have been committed and thus, provides the opportunity to correct the error at an early stage of the proceedings. While the motion for mistrial may be made as late as the end of the closing argument, a timely objection must be made in order to allow curative instructions or admonishment to counsel. As noted by defense counsel in this case, in many instances a curative instruction at the end of closing argument would be of no avail. Accordingly, defense counsel’s motion for mistrial at the end of closing argument, absent a contemporaneous objection, was insufficient to preserve this claim....
Nixon v. State, 572 So.2d 1336, 134-41 (Fla.1990) (emphasis supplied) (citations omitted).
As in Nixon, defense counsel for Bright failed to lodge a contemporaneous objection to the State’s closing statement. Instead, defense counsel waited until the prosecutor completed her argument to object and move for a mistrial. Pursuant to Nixon, we conclude that the objection to the prosecutor’s closing statement is not preserved for appeal. See also Norton v. State, 709 So.2d 87, 94 (Fla.1997) (“[Despite appellant’s motion for mistrial at the close of the witness’s testimony, his failure to raise an appropriate objection at the time of the impermissible comment failed to adequately preserve the issue for appellate review.”).
Merits — Even if defense counsel had objected contemporaneously, the trial court never ruled upon that objection. Under such circumstances, we have explained that the standard of review on direct appeal is whether the trial court abused its discretion in denying the motion for mistrial, not the harmless error standard which applies when an objection is overruled. See Poole v. State, 997 So.2d 382, 391 n. 3 (Fla.2008); Dessaure v. State, 891 So.2d 455, 465 n. 5 (Fla.2004). Accordingly, this issue is analyzed under an abuse of discretion standard.
A trial court should grant a motion for mistrial only when “the error upon which it rests is so prejudicial as to vitiate the entire trial, making a mistrial necessary to ensure that the defendant receives a fair trial.” Dessaure, 891 So.2d *260 at 464-65. To determine whether a prosecutor has improperly commented on a defendant’s right to remain silent, it is necessary to evaluate the actions of the prosecutor in context rather than focus on the challenged statement in isolation. See State v. Jones, 867 So.2d 398, 400 (Fla.2004).
Here, we conclude that the prosecutor’s statement did not constitute a comment on Bright’s right to remain silent. We agree with the trial court that the prosecutor made the challenged comment in the context of detailing Bright’s version of events to Lundy and Graham, in which he allegedly acted in self-defense. The prosecutor essentially informed the jury that, although Bright intentionally planned the murders, he could never admit such a fact to his friends or family. Therefore, the jury should disregard the versions of events that Bright articulated to Graham and Lundy because they were inconsistent with the evidence found at the crime scene.
It is true that at one point, the prosecution told the jury that Bright “cannot admit to you that it was planned.” (Emphasis supplied.) However, it appears that the prosecutor recognized her questionable wording of that statement and immediately followed it with, “He can’t admit to his friends and family members ” that the murders were planned. (Emphasis supplied.) The questionable statement was not repeated by the prosecution and may have even escaped the notice of the jury. Indeed, at sidebar, defense counsel indicated that he did not object during closing statements because he did not want to call the comment to the attention of the jury. Moreover, after closing statements, the trial court instructed the jury on Bright’s constitutional right not to testify. Given the isolated nature of the comment, the context in which the comment was made (the State advising the jury that Bright’s version of the events was inconsistent with the evidence), and the trial court’s instruction to the jury on Bright’s right not to testify, we conclude that the comments by the prosecution were not so egregious as to vitiate the entire trial. See generally Dessaure, 891 So.2d at 465.
In light of the foregoing, we hold that the prosecutor did not improperly comment on Bright’s right to remain silent, and the trial court did not abuse its discretion when it denied the motion for a mistrial.

Improper Doubling of Aggravating Circumstances

Bright next contends that the trial court improperly found and weighed as two separate aggravating circumstances his 1990 conviction for robbery and the contemporaneous murder of the other victim. Despite the State’s attempts to pinpoint sections of the record where the trial court referred to two statutory aggravating circumstances, the sentencing order clearly reflects that the trial judge found the prior violent felony aggravating circumstance twice—once for the 1990 robbery, and once for the contemporaneous murder, and accorded it great weight twice.
In Tanzi v. State, 964 So.2d 106, 117 (Fla.2007), the trial court erroneously listed the “during the course of a felony” aggravator twice. In that case, the trial court first found that the murder was committed in the course of a kidnapping and then that the murder was committed during the course of two sexual batteries. See id. at 111 n. 1. In concluding that the double finding of this aggravating circumstance was improper, this Court stated:
Nothing in [section 921.141(5)(d), Florida Statutes,] appears to authorize a trial court to treat this single aggravator as multiple and separate aggravators de *261 pending upon the number of felonies committed. Instead, if a trial court determines that a defendant committed a capital offense during the course of any of the felonies delineated above, the trial court can find this single aggravating circumstance. Of course, the trial court is free to give this single felony murder aggravating circumstance greater weight due to the fact the murder was committed during the course of multiple felonies. Therefore, the trial court in this case should have found one murder in the course of a felony aggravator based upon the multiple felonies of kidnapping and sexual battery and weighed the aggravator accordingly.
Id. at 117 (emphasis supplied) (citation omitted). We conclude that the analysis of the “during the course of a felony” aggra-vator in Tanzi is equally applicable to the prior violent felony aggravating circumstance. If a defendant has multiple convictions for prior violent felonies, the trial court can find only a single aggravating circumstance, but it may give that circumstance greater weight based upon the existence of multiple convictions. See id. at 117. Therefore, we conclude that the trial court erred when it found the prior violent felony aggravating circumstance twice and accorded it great weight twice.
The improper doubling of an aggravating circumstance by a trial court is subject to a harmless error review; that is, this Court must determine beyond a reasonable doubt that the error did not contribute to the imposition of the death sentence. See id,, at 117-18 (citing State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986)). Here, the sentencing order reflects that the erroneous double finding of the prior violent felony aggravating circumstance did not contribute to the imposition of death. As previously discussed, the trial judge expressly stated that had HAC not been applicable, life sentences would have been imposed for the murders. Therefore, we hold that the improper double finding of the prior violent felony aggravating circumstance constitutes harmless error.

HAC Aggravating Circumstance

In his next challenge, Bright asserts that the trial court improperly accorded the HAC aggravating circumstance great weight in each of the murders. We disagree. Once a trial court finds that an aggravating circumstance has been established beyond a reasonable doubt, the weight to be given “is within the discretion of the trial court, and it is subject to the abuse of discretion standard.” Buzia v. State, 926 So.2d 1203, 1216 (Fla.2006). The trial court’s assignment of great weight to the HAC aggravator in the deaths of King and Brown is consistent with other capital cases which involved beating deaths where the victim was conscious for part of the attack. See, e.g., Zommer v. State, 31 So.3d 733, 751 (Fla.) (HAC aggravator given great weight where defendant “beat [the victim] with multiple objects, kicked her, and stepped on her head, all while taunting and shouting at her”), cert. denied, — U.S. -, 131 S.Ct. 192, 178 L.Ed.2d 115 (2010); Beasley v. State, 18 So.3d 473, 480 n. 1 (Fla.2009); Beasley v. State, 774 So.2d 649, 655 (Fla.2000) (HAC aggravator accorded “very great weight” where victim was bludgeoned to death with a hammer, and victim’s body evidenced numerous defensive injuries on her hands and arms).
Here, both King and Brown were struck multiple times about the head and neck with a hammer. During the assault, Brown’s jaw and ulna were fractured, and King’s nose was fractured. Their bodies exhibited multiple defensive wounds, which is consistent with both victims being conscious and attempting to fend off the at *262 tack. The medical examiner who performed the autopsy on Brown testified that the attack on him was not brief, but lasted a period of minutes, and that each strike of the hammer would have been painful. Since King sustained more strikes to the head than Brown and more defensive injuries, it is logical to conclude that the attack on him was equally, if not more, prolonged, torturous, and painful. Given the brutality of the attacks and the large number of wounds sustained by the victims, we hold that the trial court did not abuse its discretion in finding and affording the HAC aggravating circumstance great weight.

Proportionality

In Scott v. State, 66 So.3d 923 (Fla.2011), this Court described its obligation with regard to a proportionality review:
“Due to the uniqueness and finality of death, this Court addresses the propriety of all death sentences in a proportionality review.” Hurst v. State, 819 So.2d 689, 700 (Fla.2002). In determining whether death is a proportionate penalty in a given case, we have explained our standard of review as follows:
“[W]e make a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.” We consider the totality of the circumstances of the case and compare the case to other capital cases. This entails “a qualitative review by this Court of the underlying basis for each aggravator and miti-gator rather than a quantitative analysis.” In other words, proportionality review “is not a comparison between the number of aggravating and mitigating circumstances.”
Williams v. State, 37 So.3d 187, 205 (Fla.2010) (quoting Offord v. State, 959 So.2d 187, 191 (Fla.2007)). Thus, our proportionality review requires that we discretely analyze the nature and weight of the underlying facts; we do not engage in a “ ‘mere tabulation’ of the aggravating and mitigating factors.” Terry v. State, 668 So.2d 954, 965 (Fla.1996) (quoting Francis v. Dugger, 908 F.2d 696, 705 (11th Cir.1990)).
Id. at 934-35.
Here, the jury recommended that Bright be sentenced to death by a vote of eight to four for each murder. The trial court properly found two aggravating circumstances, HAC and prior violent felony, and gave each great weight. Those aggra-vators were weighed against one statutory mitigating circumstance, extreme emotional or mental disturbance, and nineteen nonstatutory mitigating circumstances.
We have carefully reviewed both the facts of this case and death penalty precedent and have determined that the sentences imposed by the trial court are proportionate. Raymond Bright beat two young men to death. As previously discussed, Derrick King’s body was found face down on the floor, lying parallel to a sofa, and was partially "wrapped in a sleeping bag or comforter. The body of Randall Brown was found seated sideways in a recliner, leaning up against a wall, and he was covered with a blanket. The murders occurred during the night, specifically, between 11 p.m. (when Brown last phoned his mother) and 8 a.m. (when Michael Majors was unable to reach Brown on his cellular phone). The timeframe of the murders and the location of the bodies suggest that the victims may have been asleep at the time the attack began.
*263 The number and location of the injuries inflicted on each victim, the multiple defensive wounds on their bodies, and the near complete absence of injuries to Bright demonstrate that the attack was not brief, but was instead prolonged and unilateral. Moreover, the crime scene photographs contradict Bright’s contention that he killed King and Brown in self-defense. Why Bright chose to suddenly attack the victims remains a mystery; however, such ambiguity with regard to motive does not and cannot provide an independent basis for mitigation.
It may be true that Bright wanted the victims out of his house. It may also be true that the victims may have been involved in drugs and may have previously threatened him.[6] Nevertheless, these circumstances do not and cannot justify the attack by Raymond Bright on Derrick King and Randall Brown while they were unarmed and vulnerable. Although Bright has numerous redeeming qualities in mitigation — including his lengthy and admirable service in the United States Marine Corps, consistent periods of gainful employment, and kindness toward Mends and family during those times when he abstained from drugs and alcohol — we conclude that those factors do not outweigh the fact that this case involved multiple, brutal murders.
Furthermore, even though the trial court found in mitigation that Bright was under the influence of an extreme mental or emotional disturbance due to depression and the unresolved emotional issues that may have contributed to his substance abuse, we conclude there was a distinct lack of mental health mitigation in this case when compared to others where this Court vacated the death penalty. In the latter cases, significant evidence of brain damage, intoxication at the time of the murder, and mental illness were both presented and established.
For example, in Green v. State, 975 So.2d 1081 (Fla.2008), the evidence of severe mental illness was pronounced. Green shot a man in the head and stole his car. See id. at 1083. Green then shot a bull grazing in a field and, shortly thereafter, killed a retired police officer as he walked down the street. See id. at 1084. During trial, Green testified in his own defense as follows:
Green admitted walking to Cecil’s house on February 23, 2003, retrieving the gun from Cecil’s bedroom, and shooting Phipps in the head. He testified that he was hearing voices during this time. He also admitted driving off in Phipps’s car, encountering Hallman [the retired police officer], and shooting the bull. Green testified that after he shot the bull, it turned around and said, “I love you,” and he responded by saying, “I love you too.” During this time Green stated that he wanted to kill himself and that he felt he was the devil.
Green testified that he then drove back up the road and asked Hallman for directions. Green said he believed the “A” on the front of Hallman’s University of Alabama hat stood for the “Antichrist.” Green also said he interpreted Hallman’s body language as indicating that he wanted to die and that he heard a voice that told him Hallman wanted to be killed.
*264 Id. at 1085. In vacating the death penalty, this Court relied upon the extensive mental health mitigation that had been presented:
The trial court accurately described Green’s life after age 13 as “a psychological, emotional, and antisocial free fall into an abyss of aberrational, delusional and psychotic behavior.” Green was diagnosed as suffering from depression, impulse control disorder, and schizoaf-fective disorder. He refused to treat his illness and instead resorted to marijuana and ecstasy to quiet the voices in his head and cope with his depression. Shortly before committing these crimes, Green was involuntarily committed and placed in a crisis stabilization unit. Between the time he left that unit and the shootings, his mental health significantly deteriorated. In fact, all three mental health experts agreed, and the trial court found, that during the shootings “he was fully immersed in a drowning pool of mental illness.”
Id. at 1089.
Similarly, in Knowles v. State, 632 So.2d 62, 67 (Fla.1993), this Court reversed the conviction for first-degree murder of one victim and vacated the imposition of the death penalty for the first-degree murder of the second victim. In that case, the defendant was highly intoxicated at the time of the murders, and there was uncon-troverted evidence that the defendant suffered from neurological deficiencies and organic brain damage as a result of extended abuse of alcohol and solvents. See also Crook v. State, 908 So.2d 350, 358 (Fla.2005) (vacating death sentence where the rage and brutal conduct involved in the murder were related to the defendant’s brain damage and mental deficiencies); Penn v. State, 574 So.2d 1079, 1080, 1084 (Fla.1991) (vacating death sentence where defendant engaged in heavy drug use on the night of the murder); Nibert v. State, 574 So.2d 1059, 1063 (Fla.1990) (vacating death sentence where defendant was “a child-abused, chronic alcoholic who lacked substantial control over his behavior when he drank,” and the record demonstrated that he had been drinking heavily on the day of the murder).
In contrast, there is no evidence that at the time of the murders Bright was hallucinating, delusional, or intoxicated to the point of substantial impairment, or that he lacked the ability to conform his conduct to the requirements of the law. Although Bright has a long history of addiction and. substance abuse, there is no evidence of organic brain damage or neurological deficiencies resulting from that abuse. In fact, when Dr. Miller met with Bright, he found Bright to be both rational and competent. He also testified that Bright had never been diagnosed as either antisocial or psychotic. Thus, even though testimony was presented with regard to Bright’s depression and his struggles with substance abuse, the mental health mitigation evidence here simply is not comparable to the extreme evidence in mitigation that has been presented in cases where this Court has vacated the death penalty.[7]
*265 CONCLUSION
In light of the foregoing, we affirm Bright’s murder convictions and his sentences of death.
It is so ordered.
CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.

. Cast-off blood is defined as droplets of blood that are flung from a weapon so as to make a trail of blood where it lands.

. Bright’s sister, Janice Jones, also testified during the Spencer hearing as to her efforts to remove individuals who were staying in Bright's house. When asked what their names were, she replied Lavelle and Derrick. During the guilt phase, Michael Majors testified that Bright rented a room to an individual named Lavelle Copeland, who was friends with Majors and King. Jones managed to convince Copeland to call her and, when he called, she informed him that she was coming to Jacksonville and would bring the police with her. Copeland responded that he would not leave until Bright paid the money owed to him. When Jones offered to pay the money so that Copeland would leave the house, he responded, "You need to stay out of this. You don’t know what you’re getting into. It’s between me and your brother.” Copeland was not at Bright's house on the night of the murders because he was in jail.

. On a table in the home, an evidence technician found scales, money, and a "push rod,” which is used to pack drugs into a pipe or a bong. However, no drugs were found in the house other than 4.6 grams of marijuana, which was discovered inside Derrick King's sneaker.

. In the vicinity of King's body was a section of carpet that appeared to be stained with gunshot residue. Testing on the carpet was positive for gunshot residue, and a firearms expert testified that, based upon the location of the residue, a weapon had been fired within six inches of the carpet. From that stain, the evidence technicians traced a bullet trajectory and ultimately discovered a bullet lodged in the wall near the front door of the house. However, neither of the victims’ hands tested positive for gunshot residue. A firearms expert confirmed that the bullet lodged in the wall had been fired from the nine-millimeter handgun that had been discovered in the yard.

. The trial court found that the following mitigating circumstances were not proven: (1) the capacity of Bright to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; (2) Bright provided information that assisted with the resolution of the case; and (3) Bright has attempted to have a positive influence on family members despite his incarceration.

. Although Lavelle Copeland had previously threatened Bright’s sister over the telephone, there is no evidence in the record — other than Bright’s self-serving statements — -that King or Brown ever threatened him. Moreover, the record fails to demonstrate that the nine-millimeter handgun and the assault rifle located in Bright’s yard belonged to either of the victims. Further, Copeland was not present on the evening before or during these events.

. We also reject Bright's challenges to. the constitutionality of Florida's death penalty statute in light of the decision of the United States Supreme Court in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We have previously considered each of the claims presented and held them to be without merit. See, e.g., Grim v. State, 971 So.2d 85, 103 (Fla. 2007) (rejecting constitutional challenge to a capital indictment for failure to list the aggravating circumstances that the State intends to prove); Frances v. State, 970 So.2d 806, 822 (Fla.2007) (rejecting assertion that Ring requires aggravating circumstances to be found individually by a unanimous jury); Robinson v. State, 865 So.2d 1259, 1265 (Fla. 2004) (holding that the prior violent felony aggravator “involvels] *265 facts that were already submitted to a jury during trial and, hence, are in compliance with Ring”).